# CITY OF LOCKHART *v.* UNITED STATES ET AL.

No. 81–802.   Argued November 3, 1982—Decided February 23, 1983

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, REHNQUIST, STEVENS, and O'CONNOR, JJ., joined, and in Parts I and II of which BLACKMUN, J., joined. MARSHALL, J., *post*, p. 136, and BLACKMUN, J., *post*, p. 148, filed opinions concurring in part and dissenting in part. WHITE, J., dissented.

*Walter H. Mizell* argued the cause for appellant. With him on the briefs was *Douglas K. Spaulding*.

*Jose Garza* argued the cause for appellee Cano. With him on the brief were *Joaguin G. Avila, Morris J. Baller, William L. Robinson*, and *Norman J. Chachkin*. *Solicitor General Lee, Assistant Attorney General Reynolds*, and *Brian K. Landsberg* filed briefs for the United States.

JUSTICE POWELL delivered the opinion of the Court.

This case requires us to consider the application of § 5 of the Voting Rights Act to the election plan adopted by appellant City of Lockhart in 1973.

I

The City of Lockhart is a community of just under 8,000 people in Caldwell County, Texas, 30 miles south of Austin. According to the most recent census figures, almost 47% of the city's population are Mexican-American. As of 1977, however, fewer than 30% of the city's registered voters were Mexican-American.

Before 1973, Lockhart was a "general law" city. Under Texas law, general-law cities have only those powers that the State specifically permits them to possess. As authorized by state law, Lockhart was governed by a commission consisting of a mayor and two commissioners, all serving the same 2-year terms. These offices were filled in April of even-numbered years through at-large elections using a "numbered post" system. Under this system, the two commissioner posts were designated by number, and each candidate for commissioner specified the post for which he or she sought election. Thus each race was effectively a separate election for a separate office.[1]

In 1973, Lockhart adopted a new charter and became a "home rule" city. In contrast to a general-law city, a home-rule city has authority to do whatever is not specifically prohibited by the State. This includes discretion to define the form of city government and to establish the procedures for city elections. As part of its new charter, Lockhart chose to be governed by a city council consisting of a mayor and four

---

[1] This numbered-post system may be contrasted with a system in which all of the candidates for the two commissioner posts run in a single election, and the two receiving the greatest number of votes are elected.

councilmen serving staggered 2-year terms. The mayor and two of the councilmen are elected in April of even-numbered years through at-large elections using the numbered-post system. The other two councilmen are similarly elected in odd-numbered years.

Under § 5 of the Voting Rights Act of 1965, 79 Stat. 439, as amended, 42 U. S. C. § 1973c,[2] covered jurisdictions may enforce changes in their election laws only after obtaining "preclearance" in one of two ways: (i) they may obtain a declaratory judgment in the United States District Court for the District of Columbia that the changes do not have the purpose and will not have the effect of denying or abridging the right to vote on account of race, color, or membership in a

---

[2] Section 5 provides, in relevant part, as follows:

"[W]henever a State or political subdivision [such as Lockhart] shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1972, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2) [42 U. S. C. § 1973b(f)(2) (prohibiting discrimination against members of language minority groups)], and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided,* That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission . . . . Neither an affirmative indication by the Attorney General that no objection will be made, nor the Attorney General's failure to object, nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. . . . Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of [28 U. S. C. § 2284] and any appeal shall lie to the Supreme Court."

language minority group, or (ii) they may submit the changes to the Attorney General, who then has 60 days in which to object. The Act was extended to the State of Texas in 1975, covering changes in election procedures from those in effect on November 1, 1972. See 40 Fed. Reg. 43746 (1975).

In 1977, four Mexican-Americans, including appellee Alfred Cano, challenged the constitutionality of Lockhart's election procedures under the 1973 charter. *Cano* v. *Kirksey*, No. A–77–CA–133 (WD Tex., dism'd Oct. 8, 1982), appeal pending *sub nom. Cano* v. *Chesser*, No. 82–1616 (CA5, filed Nov. 8, 1982). In the course of that suit, the plaintiffs discovered that Lockhart had never obtained approval under § 5 for the changes instituted in 1973. A second suit then was brought to enjoin the city from using the new election procedures pending § 5 preclearance. The United States District Court for the Western District of Texas granted injunctive relief.[3] *Cano* v. *Chesser*, No. A–79–CA–0032 (Mar. 2, 1979) (three-judge court).

Once future elections were enjoined pending § 5 approval, Lockhart sought preclearance. The Attorney General, however, interposed an objection to the election procedures under the 1973 charter to the extent that they incorporate at-large elections, the numbered-post system, and staggered terms for councilmen. Lockhart then filed the present suit for a declaratory judgment in the United States District Court for the District of Columbia. Cano intervened as a defendant. As required by § 5, a three-judge court was convened to decide the case.

---

[3] In granting the injunction, the District Court lacked jurisdiction to pass on the discriminatory purpose or effect of the changes. All it could do was determine (i) whether a change was covered by § 5, (ii) if the change was covered, whether § 5's approval requirements were satisfied, and (iii) if the requirements were not satisfied, what remedy was appropriate. See, *e. g., United States* v. *Board of Supervisors of Warren County*, 429 U. S. 642, 645–647 (1977) *(per curiam)*. Lockhart did not appeal the District Court's finding that the 1973 charter included changes that are covered by § 5.

The District Court, recognizing that the city must prove both the absence of discriminatory effect and discriminatory purpose, bifurcated the trial. Addressing only the first issue, it held, over the dissent of Chief Judge Spottswood Robinson of the United States Court of Appeals for the District of Columbia Circuit, that Lockhart's election procedures have the effect of discriminating against protected minorities.[4] The court first decided that the entire election plan was subject to § 5's requirements. It then compared Lockhart's current system to that used before the 1973 charter, except that the court refused to recognize the city's prior use of numbered posts. This was justified on the ground that the use of numbered posts was not explicitly authorized by Texas law, and thus was illegal for a general-law city. The court concluded that numbered posts and staggered terms each have a discriminatory impact, particularly in view of the history of racial bloc voting in Lockhart.

Chief Judge Robinson, in dissent, agreed with the majority that Lockhart's city-council election procedures were subject to § 5 preclearance, and that the use of numbered posts and staggered terms tended to curb the ability of minorities to elect minority candidates. But relying on *Beer* v. *United States*, 425 U. S. 130 (1976), he concluded that there was no retrogression in minority voting strength.

The city appealed the judgment to this Court, contending that the District Court misconstrued the scope of § 5, and that, in any event, there has been no retrogression in minority voting strength. The United States, which defended the suit below, now agrees with Lockhart that the changes have no retrogressive effect on the voting rights of Mexican-Americans. Cano continues to defend the result below. We noted probable jurisdiction. 455 U. S. 987 (1982).

---

[4] In view of its decision on discriminatory effect, it was unnecessary for the District Court to reach the issue of discriminatory purpose.

## II

We consider first the scope of § 5's coverage in the circumstances of this case. Lockhart concedes that § 5 applies to its electoral changes, and that the addition of two seats to its governing body and the introduction of staggered terms are covered changes. It contends, however, that § 5 does not apply to the "continuation" of the two old seats and the continued use of numbered posts. We conclude that there has been a change with respect to all of the council seats and to the use of numbered places.

In moving from a three-member commission to a five-member council, Lockhart has changed the nature of the seats at issue. Council posts one and two are not identical to the old commission posts one and two. For example, they now constitute only 40% of the council, rather than 67% of the commission. Moreover, one cannot view these seats in isolation, for they are an integral part of the council. The possible discriminatory purpose or effect of the new seats, admittedly subject to § 5, cannot be determined in isolation from the "pre-existing" elements of the council. Similarly, the numbered-post system is an integral part of the new election plan. The impact of any of the seats cannot be evaluated without considering the fact that they are all filled in elections using numbered posts.[5] We therefore hold that the

---

[5] Lockhart seeks to rely on *Beer* v. *United States*, 425 U. S. 130 (1976), but that decision is readily distinguishable on this point. In *Beer*, we considered the reapportionment of the New Orleans councilmanic districts. The New Orleans City Council was composed of seven members, two elected at large and five elected from districts. New Orleans had reapportioned these districts through a city ordinance. "The ordinance . . . made no reference to the at-large councilmanic seats. Indeed, since those seats had been established . . . by the city charter, an ordinance could not have altered them; any change in the charter would have required approval by the city's voters." *Id.*, at 138–139. Furthermore, the ordinance did not affect the at-large councilmen in any other way. It did not change their titles. It did not increase or decrease the size of the city council. In

entire system introduced in the 1973 charter is subject to preclearance.

## III

Having decided that Lockhart's entire 1973 election plan is subject to § 5, we now determine whether the plan's changes that have not been precleared by the Attorney General have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.

## A

The first step is to identify the appropriate comparison. The District Court compared the new plan to what the old practice would have been without numbered posts. It justified this comparison on the ground that a general-law city such as Lockhart was not entitled under Texas law to use a numbered-post system. The court, distinguishing *Perkins* v. *Matthews*, 400 U. S. 379 (1971), reasoned that recognition of the actual practice rather than the legal requirement would reward the city for its past illegality. It preferred instead to draw its comparison in a way that would maximize the reach of § 5.

Texas law is not entirely clear on this point,[6] but that is essentially irrelevant. The proper comparison is between the new system and the system actually in effect on November 1, 1972,[7] regardless of what state law might have required. This basis of comparison was established in *Perkins* v. *Matthews, supra.* There a city conducted the relevant

---

short, the ordinance affected only the district councilmen. It was only in these circumstances that "[t]he at-large seats . . . were not subject to review . . . under § 5." *Id.,* at 139.

[6] There does not appear to be any Texas case law on the subject. Lockhart had used its numbered-post system for over 50 years without challenge, suggesting a presumption of legality under state law.

[7] Since no election was held on November 1, 1972, we consider the system that would have been in effect if there had been an election then. That, presumably, is the system that was used without exception between 1917 and 1973. See *Perkins* v. *Matthews,* 400 U. S., at 394–395.

election for aldermen by wards, despite a state statute requiring at-large elections. As the *Perkins* Court explained:

"In our view, § 5's reference to the procedure 'in force or effect on November 1, 19[72],' must be taken to mean the procedure that would have been followed if the election had been held on that date." 400 U. S., at 394.

This conclusion was based on the plain reading of the section's language. It is, moreover, in accord with the Act's underlying policy. Section 5 was intended to halt actual retrogression in minority voting strength without regard for the legality under state law of the practices already in effect.[8]

### B

We now consider whether the aspects of the new system to which the Attorney General objected, when compared to the practices in use in Lockhart prior to the new charter, have the effect of denying or abridging the right to vote guaranteed by § 5. Our inquiry is guided by the principles of *Beer* v. *United States*, 425 U. S. 130 (1976).[9]

*Beer* involved the reapportionment of the New Orleans councilmanic districts. Prior to the reapportionment, black citizens had a clear majority of the population and a bare majority of the registered voters in one of the five districts. In a second district, they had just under a majority of the population. Under the new plan, blacks had slightly larger popu-

---

[8] We also believe that the Attorney General and the District Court for the District of Columbia should be free to decide preclearance questions on the essentially factual issues of discriminatory purpose and effect. We doubt that Congress intended to force either into speculation as to state law.

[9] Cano argues on appeal that Congress altered the *Beer* standard with the recent amendment to § 2 of the Voting Rights Act, 79 Stat. 437, as amended, 42 U. S. C. § 1973, see Voting Rights Act Amendments of 1982, Pub. L. 97–205, 96 Stat. 131. The District Court did not pass on this argument, and we decline to review it in the first instance. The issue remains open on remand.

lation and voter majorities in the first district, and a bare majority of the population in the second. Although the new plan may have remained discriminatory, it nevertheless was not a regressive change. The Court explained that "[t]he language of § 5 clearly provides that it applies only to proposed changes in voting procedures." *Id.,* at 138. "[T]he purpose of § 5 has always been to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Id.,* at 141.[10] Since the new plan did not increase the degree of discrimination against blacks, it was entitled to § 5 preclearance.

We apply these principles to the two aspects of the new system that remain at issue in this case: the numbered-post system and staggered terms for councilmen.[11] It is recognized that a numbered-post system, in some circumstances, may have the effect of discriminating against minorities in a

---

[10] Contrary to the suggestion in JUSTICE MARSHALL's dissent, *post,* at 142–143, the *Beer* Court did not distinguish between ameliorative changes and changes that simply preserved current minority voting strength. The Court explained that the purpose of § 5 was to prohibit only retrogressive changes. 425 U. S., at 141. It then applied this standard to the New Orleans reapportionment, agreeing that an ameliorative change was *a fortiori* permissible. *Ibid.* The only suggestion in the several *Beer* opinions that there might be a distinction between ameliorative and nonameliorative changes was not in the Court's opinion; rather it was in JUSTICE MARSHALL's dissent, *id.,* at 150, n. 6, and he explained why the distinction is "unrealistic," *ibid.* Cf. *id.,* at 143 (WHITE, J., dissenting) ("I cannot agree [with the Court] that § 5 . . . reaches only those changes in election procedures that are more burdensome to the complaining minority than pre-existing procedures"); see also *City of Richmond* v. *United States,* 422 U. S. 358, 388 (1975) (BRENNAN, J., dissenting) ("[T]he fundamental objective of § 5 [is] the protection of *present* levels of voting effectiveness for the black population") (emphasis in original). JUSTICE MARSHALL's current dissenting opinion essentially reiterates the position stated forcefully in his *Beer* dissent—a position rejected by a majority of the Court at that time.

[11] The Attorney General also objected to the use of at-large elections, but the District Court did not hold, and the parties before us do not argue, that the continued existence of at-large elections has a retrogressive effect.

city where racial bloc voting predominates. Use of numbered posts may frustrate the use of "single-shot voting," a technique that permits concentrating support behind a single candidate. Lockhart has used numbered posts, however, consistently since 1917. Effective single-shot voting may be impossible now, but it was equally impossible under the old system. The new system may highlight individual races, but so did the old. As Chief Judge Robinson concluded, "the voting strength of Lockhart's minorities, whether or not enhanced, [has not been] diminished one whit." 559 F. Supp. 581, 595 (1981). The District Court erred in finding that the continued use of numbered posts has a retrogressive effect on minority voting strength.

The use of staggered terms also may have a discriminatory effect under some circumstances, since it, too, might reduce the opportunity for single-shot voting or tend to highlight individual races. But the introduction of staggered terms has not diminished the voting strength of Lockhart's minorities. Under the old system, the voters faced two at-large elections with numbered posts every two years. Now they face two at-large elections with numbered posts every year. The inability to use single-shot voting is identical. The degree of highlighting of individual races is identical. Minorities are in the same position every year that they used to be in every other year. Although there may have been no improvement in their voting strength, there has been no retrogression either.

Cano argues that the increased frequency of elections made necessary by staggered terms has resulted in retrogression. The more frequent elections are said to reduce voter turnout, and this has a disproportionate impact on minority voters. In support of this argument, he cites figures from the April 1975 election. That year, when voter turnout was unusually low, only 5.7% of the voters were Mexican-Americans. In other years since 1973, the percentage of Mexican-American voters has been three to six times as great. These

figures, however, are misleading. In the April 1975 election, both council candidates were running unopposed, and neither candidate was Mexican-American. This undoubtedly explains both the lower overall turnout and the lower turnout among Mexican-Americans. For other elections since 1973, the overall turnout and the Mexican-American turnout were consistently higher than they were before the new charter, despite the fact that the population increased only slightly. In 1978, a Mexican-American candidate was elected in Lockhart for the first time in its history, after five years of annual elections. The record, therefore, contradicts Cano's argument. The District Court erred in finding that the introduction of staggered terms has had a retrogressive effect on minority voting strength.

## IV

Applying the standards of *Beer* v. *United States*, we conclude that the election changes introduced by the 1973 Lockhart City Charter will not have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. The District Court's findings to the contrary were clearly erroneous. We accordingly vacate the District Court's judgment, and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE WHITE dissents.

JUSTICE MARSHALL, concurring in part and dissenting in part.

I disagree fundamentally with the Court's view that § 5 of the Voting Rights Act permits jurisdictions with a history of voting discrimination to adopt new voting schemes which perpetuate that discrimination. Congress intended the preclearance requirement to be a powerful measure for advancing the goals of the Fifteenth Amendment, and specifically reaffirmed that intention when it reenacted the Voting

Rights Act in 1982. By holding that § 5 forbids only electoral changes that *increase* discrimination, the Court reduces § 5 to a means of maintaining the status quo. Because the Court's interpretation of § 5 is flatly inconsistent with both the language and the purpose of that provision and is not supported by the decision in *Beer* v. *United States*, 425 U. S. 130 (1976), I dissent from Parts III and IV of the Court's opinion.

I would affirm the judgment below on the basis of the District Court's conclusion, which this Court in no way questions, that the city of Lockhart's "imposition of the numbered-post and staggered-term provisions has clearly had and *will continue to have*" a discriminatory effect on Mexican-American voters. 559 F. Supp. 581, 588 (1981) (emphasis added).[1]

Indeed, it bears repeating and should be reemphasized that the Fifteenth Amendment "nullifies sophisticated as well as simple-minded modes of discrimination." *Lane* v. *Wilson*, 307 U. S. 268, 275 (1939).

## I

The Court's view that § 5 of the Voting Rights Act permits the adoption of a discriminatory election scheme, so long as the scheme is not more discriminatory than its predecessor, is inconsistent with both the language and the purpose of that provision. In focusing exclusively on whether Lockhart's new election scheme worsens the position of minority voters, and ignoring whether the new scheme itself has a discriminatory effect, see *ante*, at 133–136, the Court substitutes an inquiry of its own invention for the inquiry mandated by § 5. For the reasons elaborated below, I believe that § 5 forbids preclearance of a proposed election procedure that perpetuates existing discrimination.

---

[1] I also agree with JUSTICE BLACKMUN that the decision below should be affirmed on the separate ground that the District Court's factual finding that the electoral changes had a retrogressive effect is not clearly erroneous.

## A

The Court's interpretation of § 5 is inconsistent with the language of that provision. Section 5 provides that a covered jurisdiction must obtain preclearance of any new "voting qualification, or prerequisite to voting, or standard, practice, or procedure with respect to voting." 79 Stat. 439, as amended, 42 U. S. C. § 1973c. The jurisdiction bears the burden of proving that the proposed

> "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting . . . will not have the effect of denying or abridging the right to vote on account of race or color, or [membership in a language minority group] . . . ." *Ibid.*

By its terms § 5 focuses on the effect of the new voting procedure itself, *not* on the difference between the new procedure and its predecessor. The statute specifically requires that the new procedure not have the effect of denying or abridging the right to vote on a discriminatory basis. Although it is relevant for purposes of § 5 whether the change to the new practice diminishes minority voting strength, to say that the effect of the change is part of the § 5 inquiry is far different from holding, as the Court does, that this is the *sole* inquiry in determining whether a new procedure has a discriminatory effect. Nothing in the language of § 5 in any way suggests that a discriminatory election procedure satisfies § 5 as long as the procedure does not increase the degree of discrimination.

## B

The Court's view is also wholly inconsistent with the purpose of § 5. The legislative history of the Voting Rights Act leaves no doubt that Congress intended § 5 to prohibit the covered jurisdictions from adopting voting procedures which perpetuate past discrimination, which is precisely what the procedures proposed by Lockhart would do. Moreover, Congress reaffirmed this intent when it reenacted the Voting Rights Act in 1982.

The Voting Rights Act of 1965 was enacted as a direct response to the failure of prior efforts to implement the guarantees of the Fifteenth Amendment. Congress recognized that voting discrimination was a nationwide problem, and it therefore enacted a general prohibition of discriminatory practices. See, *e. g.*, §§ 2, 3, 79 Stat. 437, as amended, 42 U. S. C. §§ 1973, 1973a. Congress was particularly concerned, however, with the "systematic exclusion of Negroes from the polls that characterizes certain regions of this Nation." H. R. Rep. No. 439, 89th Cong., 1st Sess., 8 (1965). It identified a number of jurisdictions that had "engaged in widespread violations of the 15th amendment over a period of time," *id.*, at 14,[2] and provided that these jurisdictions would be subject to certain stringent remedial measures that were not made applicable nationwide. The most important of these remedial measures was the preclearance requirement of § 5.

The specific purpose of § 5 was to prevent these jurisdictions from continuing the pervasive practice of adopting new voting procedures which perpetuated existing discrimination. Congress was alarmed at the success with which certain States had evaded the strictures of earlier voting laws by resorting to "the extraordinary stratagem of contriving new rules . . . for the sole purpose of *perpetuating* voting discrimination in the face of adverse federal court decrees." *South Carolina* v. *Katzenbach*, 383 U. S. 301, 335 (1966) (footnote omitted) (emphasis added). The historical experience of attempts to enforce voting laws in those States revealed that "[b]arring one contrivance too often has caused no change in result, only in methods." H. R. Rep. No. 439, *supra*, at 10. See also S. Rep. No. 162, 89th Cong., 1st

---

[2] See also H. R. Rep. No. 94–196, p. 16 (1975) (explaining expansion of list of covered jurisdictions to include those with a "systematic pattern of voting discrimination and exclusion against minority group citizens" who are from environments in which the dominant language is other than English).

Sess., pt. 3, p. 5 (1965).[3]  Congress concluded that enforcement of the Fifteenth Amendment and the specific prohibitions of the Voting Rights Act of 1965 would not be effective if these States remained free to adopt new electoral procedures that continued to discriminate against minority voters.  See *South Carolina* v. *Katzenbach, supra,* at 335.

In order to prevent such evasive maneuvers, Congress required jurisdictions with a pervasive history of voting discrimination to obtain preclearance of any new voting plan. As this Court has recognized, § 5 was designed to suspend "all new voting regulations pending review by federal authorities to determine whether their use would *perpetuate* voting discrimination."  383 U. S., at 316 (emphasis added). "After enduring nearly a century of systematic resistance to the Fifteenth Amendment, Congress . . . shift[ed] the advantage of time and inertia from the perpetrators of the evil to its victims."  *Id.,* at 328.

When Congress reenacted the Act in 1970, 1975, and 1982, it consistently reaffirmed the central purpose of § 5: to promote the attainment of voting equality by preventing the adoption of new voting procedures which perpetuate past discrimination.  The House Report accompanying the 1970 extension of the Act viewed § 5 as a means of "preclud[ing]" the covered States from resorting to "new voting rules . . . in order to *perpetuate* discrimination."  H. R. Rep. No. 91–397, pp. 6–7 (1969) (emphasis added).[4]  Similarly, when

---

[3] The House Report accompanying the 1965 Act described at great length the "ingenuity and dedication of those determined to circumvent the guarantees of the 15th amendment."  H. R. Rep. No. 439, 89th Cong., 1st Sess., 10 (1965).  Certain jurisdictions would adopt facially neutral changes in voting requirements which ensured that "white political supremacy was unlawfully *maintained.*"  S. Rep. No. 162, 89th Cong., 1st Sess., pt. 3, p. 8 (1965) (emphasis added).

[4] The Senate Judiciary Committee stated:

"If it had not been for Section 5 of the present Act, there is no telling to what *extent the states and communities covered might have legislated and manipulated to continue their historical practice* of excluding Negroes from

Congress extended and amended the Act in 1975, it stated unequivocally that § 5 was adopted "[i]n order to insure that any future practices of these jurisdictions be free of both discriminatory purpose and effect." H. R. Rep. No. 94–196, p. 8 (1975); S. Rep. No. 94–295, p. 15 (1975). See also H. R. Rep. No. 94–196, *supra*, at 8, 57; S. Rep. No. 94–295, *supra*, at 15–18. When Congress reenacted the Voting Rights Act in 1982, it stressed that § 5 is "designed to insure that old devices for disenfranchisement would not simply be replaced by new ones," to prohibit new "complex and subtle . . . schemes [that] perpetuate the results of past voting discrimination," and to "eradicat[e] the continuing effects of past discrimination." S. Rep. No. 94–417, pp. 6, 12, 44 (1982).[5]

The Court's interpretation of § 5 disregards the central purpose of that provision. The Court holds that § 5 is satisfied as long as a change in electoral procedure does not increase the level of discrimination, even if the new procedure perpetuates past discrimination. In holding that § 5 prevents only the adoption of procedures that worsen the position of minority voters, the Court completely ignores the very reason why Congress imposed the preclearance requirement on jurisdictions with a pervasive history of voting dis-

---

the Southern political process." Joint Views of Ten Members of the (Senate) Judiciary Committee Relating to Extension of the Voting Rights Act of 1965, 91st Cong., 2d Sess., printed at 116 Cong. Rec. 5521 (1970) (emphasis added), cited in S. Rep. No. 97–417, p. 7 (1982).

[5] This Court's decisions have consistently recognized that § 5 was designed to prevent the adoption of new electoral procedures that would maintain pre-existing voting discrimination. In *Allen* v. *State Board of Elections*, 393 U. S. 544, 548 (1969), the Court stated that Congress enacted § 5 to counter the historical practice of some States "of simply enacting new and slightly different requirements with *the same discriminatory effect*" (emphasis added) (footnote omitted). Most recently, in *City of Rome* v. *United States*, 446 U. S. 156, 182 (1980), the Court observed that Congress readopted the § 5 preclearance requirement in 1975 in order "to *promote further amelioration* of voting discrimination" and "to *counter the perpetuation* of 95 years of pervasive voting discrimination" (emphasis added) (quoted in S. Rep. No. 97–417, *supra*, at 10, n. 19, 53.

crimination: to prevent the *perpetuation* of past discrimination through the adoption of new discriminatory procedures. The Court's interpretation of § 5 permits a covered jurisdiction to circumvent the Fifteenth Amendment and the general prohibitions of the Voting Rights Act in precisely the way that Congress sought to foreclose.

## II

The Court's interpretation of § 5 is not supported by the decision in *Beer* v. *United States,* 425 U. S. 130 (1976). *Beer* did not hold that a nonameliorative change in electoral procedure should be precleared even if the new procedure perpetuates past discrimination. Today's decision represents an extension of *Beer* which is unsupported by any of the purposes of the Voting Rights Act and is inconsistent with Congress' understanding of § 5 when it reenacted the Voting Rights Act in 1982.

## A

The Court's decision in *Beer* concerned an electoral change that improved the voting strength of minorities. In *Beer* the Court found that the reapportionment plan at issue *enhanced* the position of Negro voters, since it increased the number of districts in which they constituted a majority. 425 U. S., at 141–142. The Court stated its holding as follows: "We conclude . . . that such an *ameliorative* new legislative apportionment cannot violate § 5 unless the new apportionment itself so discriminates on the basis of race or color as to violate the Constitution." *Id.,* at 141 (emphasis added). That the Court viewed the ameliorative nature of the reapportionment as central to its holding is confirmed by footnote 14 of the opinion, which states: "It is possible that a legislative reapportionment could be a substantial improvement over its predecessor in terms of lessening racial discrimination, and yet nonetheless continue so to discriminate on the basis of race or color as to be unconstitutional." *Id.,* at 142, n. 14.[6]

---

[6] It is hardly an answer to say, as the Court does, *ante,* at 134, n. 10, that *Beer* did not "distinguish between" ameliorative changes and changes that

*Beer* did not involve a change in electoral procedure which, like the one before us, preserves the existing level of discrimination against minority voters. A new electoral scheme which does nothing more than perpetuate past discrimination differs in a critical way from a voting scheme which enhances minority voting strength. By improving the position of minority voters, an ameliorative change represents some progress in attaining voting equality, the fundamental goal of the Voting Rights Act. In contrast, an electoral scheme that does not enhance minority voting strength but merely maintains existing discrimination does not further any conceivable purpose of the Act. Although the reapportionment in *Beer* may not have eliminated past discrimination, at least it enhanced the political position of minority voters. This cannot be said of Lockhart's 1973 charter, which merely continues the pattern of voting discrimination that has prevailed in that city.

While I dissented in *Beer* on the ground that preclearance of any electoral plan which has a discriminatory effect is inconsistent with the mandate of § 5, the departure in *Beer* from the plain language of § 5 was at least reconcilable with the broad purposes of the Voting Rights Act. There is no similar justification for today's decision. In light of the language and purpose of § 5 and the overall purposes of the Act, it is perverse to interpret § 5 to authorize preclearance of

---

do not enhance minority voting strength. The decision in *Beer*, as Congress recognized when it reenacted § 5 in 1982, see *infra*, at 145–146, concerned only an ameliorative reapportionment, and the Court specifically stated its holding in terms of a change in electoral procedure that is ameliorative. It simply had no occasion to consider the proper treatment under § 5 of discriminatory electoral procedures that do not lessen past discrimination. Today's decision extends *Beer* to cover electoral schemes that are not ameliorative. The Court does not even attempt to demonstrate that this extension can be squared with the language, purpose, and legislative history of § 5, or that it serves any purpose of the Voting Rights Act. The reason for the Court's silence is obvious: Congress clearly intended § 5 to prohibit the adoption of electoral procedures that perpetuate past discrimination.

electoral changes that maintain a discriminatory status quo. The Court's interpretation of § 5 robs it of its basic function of preventing the perpetuation of past discrimination, without in any way advancing a single purpose of the Voting Rights Act.

## B

To support its interpretation of § 5, the Court relies solely on a statement in *Beer* to the effect that § 5 is designed to prevent retrogression in the position of minority voters. *Ante,* at 134, citing 425 U. S., at 141. That statement, which was made in an opinion addressing an electoral change that *reduced* discrimination, rested on an isolated passage in the legislative history of the 1975 reenactment of the Voting Rights Act. That passage does not support today's decision. The passage appears in a section of a House Judiciary Committee Report which criticized the narrow view of § 5 that had prevailed within the Department of Justice. The Committee noted that the Department of Justice had chosen to focus exclusively on "whether the administration of [an electoral] change has been, is, or will be without bias." H. R. Rep. No. 94–196, p. 60 (1975). The Committee criticized this view of § 5 as unduly narrow:

> "We recommend that the Department of Justice, in determining whether a change affecting voting will have the effect of discriminating on the basis of race or color, apply the standard as Congress intended it and as the Supreme Court of the United States has interpreted it. That standard is not fully satisfied by an indication that the administration of the change affecting voting will be impartial or neutral. Rather that standard can only be fully satisfied by determining . . . whether the ability of minority groups to participate in the political process and to elect their choices to office is augmented, diminished, or not affected by the change affecting voting in

view of the political, sociological, economic, and psychological circumstances within the community proposing the change." *Ibid.*

It may be inferred from this passage that the Committee intended § 5 to prohibit changes that would diminish the voting strength of minorities. There is no indication, however, that in criticizing the Department of Justice for ignoring the effect of the change as part of the "broader inquiry" into discriminatory effect under § 5, *ibid.*, the Committee meant to suggest that a discriminatory scheme should be precleared as long as it does not increase the existing level of discrimination. The Report simply does not address the proper treatment of such a scheme.

## C

When Congress reenacted § 5 in 1982, it did so on the understanding that § 5 does not allow covered jurisdictions to adopt voting procedures which maintain existing discrimination. Congress reenacted § 5 on the assumption that the rule laid down in *Beer* governed *ameliorative* changes. In a section of its Report specifically addressing the reenactment of § 5, the Senate Judiciary Committee stated:

"Under the rule in *Beer* v. *United States*, 425 U. S. 130 (1976), a voting change which is ameliorative is not objectionable unless the change 'itself so discriminates on the basis of race or color as to violate the Constitution.' 425 U. S., at 141; see also 142, n. 14 (citing to the dilution cases from *Forston* v. *Dorsey*[, 379 U. S. 433 (1965),] through *White* v. *Regester*[, 412 U. S. 755 (1973]). In light of the amendment to section 2, it is intended that a section 5 objection also follow if a new voting procedure itself so discriminates as to violate section 2." S. Rep. No. 97–417, p. 12, n. 31 (1982).

In stating the "rule in *Beer*" in terms of the holding of that decision, the Committee clearly indicated its understanding that that rule applies to *ameliorative* changes. There is no

indication that the Committee understood *Beer* also to apply to nonameliorative changes. Indeed, the implication is to the contrary, and the legislative history of the 1982 Amendments, including the same Report from which this passage is taken, shows that Congress repeatedly stressed that § 5 is intended to prevent covered jurisdictions from adopting voting schemes that perpetuate existing discrimination. See *supra*, at 141.

In addition, the second sentence of the passage quoted above confirms that Congress did not intend to limit the focus of § 5 to whether an electoral change worsens the position of minority voters. The Committee indicated that a new procedure would be denied preclearance under § 5 if it violated the standards governing the amended § 2. A voting procedure violates § 2 if it "results in a denial or abridgement" of the right to vote on a discriminatory basis, whether or not the procedure worsens the position of minority voters. Pub. L. 97–205, § 3, 96 Stat. 134, 42 U. S. C. § 1973 (1982 ed.).[7] In reenacting § 5 with the intent that a voting pro-

---

[7] Section 2 provides:

"(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).

"(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."

cedure violating § 2 should be denied preclearance under § 5, Congress surely made clear its understanding that § 5 forbids the adoption of a voting procedure that maintains existing discrimination whether or not the change is retrogressive.

There is no justification for the Court's refusal to consider the 1982 reenactment of § 5 and amendment of § 2. *Ante,* at 133, n. 9. Both went into effect immediately and are applicable to this case. Pub. L. 97–205, § 6, 96 Stat. 135. In deciding that Lockhart's 1973 charter does not have the "effect of abridging or denying the right to vote" within the meaning of § 5, the Court is bound to apply the law as it now stands. Although Congress reenacted § 5 without change, its understanding of the scope of that provision is plainly relevant to the issue before us. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran,* 456 U. S. 353, 384–388 (1982). By extending *Beer* and holding that discriminatory electoral schemes may be precleared as long as they do not increase the level of discrimination, the Court has interpreted § 5 in a manner squarely inconsistent with Congress' intent in reenacting that provision.

## III

In my view § 5 does not authorize the preclearance of any electoral scheme that is discriminatory in effect and that does not reduce past discrimination. The very purpose of § 5 is to prevent covered jurisdictions from circumventing the protections of the Voting Rights Act and the Constitution by the adoption of electoral schemes which perpetuate past discrimination. The considerations that may support the preclearance of ameliorative schemes have no application to electoral changes which perpetuate past discrimination or which actually increase the level of discrimination.

An electoral change which preserves the status quo should be denied preclearance if the new procedure continues to deny minority voters an equal chance to participate in the

electoral process and elect candidates of their choice.[8]   The District Court noted that although Mexican-Americans constitute over 40% of the population of Lockhart, only one Mexican-American has ever served on the governing body. Because of the established pattern of racial bloc voting in Lockhart, Mexican-American voters can elect candidates of their choice only by leveraging their vote through single-shot voting.   As the District Court recognized, the imposition of numbered posts and staggered elections, both features of the 1973 charter, diminishes this leverage to the detriment of minority-supported candidates.[9]   The District Court concluded that the use of staggered terms and numbered seats in Lockhart has had and will continue to have a "discriminatory effect on Mexican-American voters' ability to elect candidates of their choice."   Since this conclusion is undisturbed by the Court, § 5 preclearance should be denied for the simple reason that preclearance of a voting scheme that will perpetuate a history of voting discrimination is flatly inconsistent with the very purpose of § 5.

JUSTICE BLACKMUN, concurring in part and dissenting in part.

I join Parts I and II of the Court's opinion, but I dissent from Parts III and IV.   My review of the record convinces me that the three-judge District Court's factual finding that the electoral changes introduced in 1973 had a retrogressive

---

[8] This is the test that governs the determination of whether a voting procedure "results in a denial or abridgement" of the right to vote in violation of § 2 as recently amended.   See n. 7, *supra*.   See also S. Rep. No. 97–417, p. 28 (1982); see generally *id.*, at 15–43.

[9] Congress specifically identified numbered posts and staggered terms as "discriminatory elements of the elections process" which "often dilute emerging minority political strength" "in the covered jurisdictions, where there is severe racially polarized voting."   H. R. Rep. No. 97–227, p. 18 (1981).   See also S. Rep. No. 97–417, *supra*, at 10 (identifying numbered posts as one of the "impediments that still face minority voters").

effect on the voting rights of Mexican-Americans in the city of Lockhart is not clearly erroneous. I therefore would affirm the judgment of the District Court. At the very least, I would remand the case to that court for it to determine whether the Voting Rights Act Amendments of 1982, Pub. L. 97–205, 96 Stat. 131, have altered the applicable standard under § 5.