**394**

STATE OF NEW YORK, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 94–2219 (JLB
U.S.C.A., RCL, PLF).

United States District Court,
District of Columbia.

Dec. 22, 1994.

Mark G. Peters, New York State Dept. of Law Litigation, New York City, for State of N.Y.

Thomas Christian Herren, U.S. Dept. of Justice, Civil Rights Div., Washington, DC, for U.S.

Before BUCKLEY, LAMBERTH and FRIEDMAN, JJ.

*MEMORANDUM OPINION*

LAMBERTH, District Judge.

On November 4, 1994, this Court issued an order prohibiting the State of New York from certifying the results of the November 8, 1994 state judicial elections in the Second and Twelfth Judicial Districts (Bronx and Kings Counties) until New York had obtained preclearance for the newly created judgeships from the Attorney General or from this Court as required by section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c. On December 5, 1994 the Attorney General denied administrative preclearance on the grounds that New York had failed to establish that its plan to create the additional judgeships would not have the purpose or effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. *Id.* Pursuant to the procedure established by section 5 of the Voting Rights Act, plaintiff State of New York now seeks a declaratory judgement from this Court that the decision to add new judges to the New York Supreme Court does not have the purpose and will not have the effect of discriminating against minority voters. This case comes before the Court on plaintiff State of New York's motion for summary judgment. The United States opposes summary judgment and contends that it requires further discov-

ery in order to establish that New York's decision to create the new judgeships was motivated by a discriminatory purpose. For the reasons set forth below, New York's motion for summary judgment will be granted.

## I. Facts

Section 5 of the Voting Rights Act of 1965 requires any state or political subdivision covered by the Act to obtain preclearance of proposed changes to voting laws before those changes may be implemented.[1] 42 U.S.C. § 1973c. Preclearance may be obtained in one of two ways. A state may seek judicial preclearance by filing a declaratory judgment action in the United States District Court for the District of Columbia, or it may seek administrative preclearance by submitting the proposed change to the Attorney General of the United States. *Id.* The purpose of the preclearance requirement is to ensure that proposed changes to voting laws "do[ ] not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color" or membership in a minority language group. *Id.*

The State of New York has sought from the Attorney General preclearance for the creation of 15 new judgeships on the State's trial court of general jurisdiction, the Supreme Court of New York. Some of these judgeships were created as early as 1982, some in 1990 and one as recently as 1994. New York has been trying to obtain administrative preclearance from the Attorney General for 14 of the judgeships for just over a year and recently filed its request for preclearance with respect to the judgeship created by the 1994 New York State legislature. On December 5, 1994, the Acting Assistant Attorney General for the Civil Rights Division of the United States Department of Justice, acting on behalf of the Attorney General, sent the State of New York a letter formally denying preclearance for the proposed addition of judges.[2]

Elections that would fill two of the judgeships subject to preclearance authorization were held on November 8, 1994. Candidates who were elected to judgeships on November 8 are scheduled to take office on January 1, 1995. As noted above, however, an earlier Order of this Court enjoined the State of New York from certifying the results of the November 8 elections until the legislation creating the new judgeships receives preclearance. Efforts to resolve the preclearance issue with the Department of Justice proved unsuccessful, and plaintiff moved for summary judgment in this Court, with the hope that a decision might be made in time to swear in the newly elected judges on January 1.[3]

1. Both of the voting districts at issue here are "covered" jurisdictions under section 4 of the Act. 42 U.S.C. § 1973b(b).

2. The Assistant Attorney General's letter describes in detail the existing system for electing judges in New York. A brief description of this process is warranted. Justices of the Supreme Court of New York, the trial court of general jurisdiction, are elected at large within their electoral districts by a plurality vote and serve fourteen-year terms. Candidates are selected at party nominating conventions, and, as both sides seem to agree (at least with respect to Bronx and Kings Counties), "the election itself [is], in effect, a mere ratification of the action of the Democratic Party convention." Letter from Loretta King, Acting Assistant Attorney General, Civil Rights Division, to G. Oliver Koppell, Attorney General, State of New York 2 (Dec. 5, 1994). Defendant maintains that the slating process used to nominate judicial candidates prevents minority voters from participating in the electoral process on an equal basis with nonminorities. The legislation creating the additional judgeships provides that the new judges will be elected in the same manner as existing judges. Defendant maintains that

in creating the new judgeships New York State legislators rejected "[n]umerous alternative judicial selection systems ... which would have provided more equal access to the political process for minority voters." *Id.* This apparently was the basis for the Attorney General's conclusion that New York had not met its section 5 burden of establishing that the proposed addition of judges was free from discriminatory purpose and effect.

3. Shortly before the scheduled date for oral argument on the summary judgment motion, four incumbent judges who had been reelected on November 8 moved to intervene in this suit. The incumbent judges argued that because they had simply been reelected to offices they already occupied, none of them could be said to hold either of the two unprecleared judgeships that were filled on November 8. This Court denied the motion to intervene but granted the incumbent judges *amicus curiae* status so that they would have an opportunity to brief the Court in the event it became necessary to consider an interim remedy whereby some but not all of the judges elected on November 8 were permitted to take

In deciding whether the Court may properly grant New York's summary judgment motion, we must resolve two separate issues. First, we must decide whether New York has met its burden of demonstrating that the creation of the additional judgeships at issue has neither the purpose nor the effect of discriminating against minority voters. Second, we must determine whether the United States has been given an adequate chance to discover evidence relevant to this issue. As the party resisting summary judgment, the United States must provide evidence that would permit a reasonable fact-finder to conclude that New York's decision to create the new judgeships was motivated by a discriminatory purpose. Summary judgment is only appropriate if the defendant has had a sufficient opportunity to discover such evidence.

## II. The Proper Scope of a Section 5 Inquiry

The Voting Rights Act of 1965 was passed by Congress in an effort finally to make real the promise of the Fifteenth Amendment that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1. Section 2 of the Act prohibits any voting practice "which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color," or language minority status. 42 U.S.C. § 1973(a). A section 2 plaintiff may challenge an existing voting system on the grounds that it denies minority citizens an equal opportunity to participate in the electoral process. In a section 2 proceeding, the plaintiff bears the burden of proving that the challenged voting scheme has a discriminatory effect on minority voters.

Section 5 of the Voting Rights Act was intended to prevent jurisdictions with a history of discrimination from thwarting minority progress by requiring "covered" jurisdictions to submit any proposed electoral changes to the Attorney General or to this Court for preclearance review. *See Beer v.*

United States, 425 U.S. 130, 140–41, 96 S.Ct. 1357, 1363–64, 47 L.Ed.2d 629 (1976). Analysis of proposed voting changes under section 5 entails a two-pronged inquiry: first, the changes must not result in a discriminatory effect, and second, the changes must not have been motivated by a discriminatory purpose. Under section 5, the jurisdiction seeking preclearance bears the burden of establishing that the proposed changes are free from discriminatory effect and purpose.

### A. Discriminatory Effects

The "effects" prong of the section 5 analysis has received by far the greater amount of consideration from the courts, and the Supreme Court has developed a straightforward test for analyzing effects under section 5. According to this so-called "retrogression" analysis, whether a proposed voting change has an impermissible effect under section 5 is determined by comparing the *existing* voting scheme with the scheme that would *result* from the proposed changes. If the position of minority voters is no worse under the new scheme than it was under the old scheme, then the proposed change is entitled to preclearance under section 5. *See City of Lockhart v. United States,* 460 U.S. 125, 132–35, 103 S.Ct. 998, 1003–04, 74 L.Ed.2d 863 (1983); *Beer,* 425 U.S. at 141, 96 S.Ct. at 1363–64. Defendant concedes, and we agree, that the creation of new judgeships in New York would not have a retrogressive effect. Defendant contends, however, that a change which does not have a *retrogressive* effect may nevertheless have an effect which is impermissible under section 5, *Beer* and *Lockhart* notwithstanding.

Defendant maintains that the amendments to the Voting Rights Act enacted by Congress in 1982 were intended to alter the retrogression test applied by the Supreme Court in *Beer* and *Lockhart.* This theory has its genesis in Justice Marshall's dissenting opinion in *Lockhart* in which he argued that the 1982 amendments changed the substantive content of section 5—in effect incorporating the substantive provisions of section

office pending final resolution of this case. Given the Court's resolution of this matter, no such

briefing will be necessary.

2—despite the fact that section 5's language was not changed by the amendments. According to Justice Marshall, the legislative history of the 1982 amendments reveals that "Congress repeatedly stressed that § 5 is intended to prevent covered jurisdictions from adopting voting schemes that perpetuate existing discrimination." *Lockhart,* 460 U.S. at 146, 103 S.Ct. at 1010 (Marshall, J., dissenting). In support of this conclusion, Justice Marshall quoted a footnote in the Senate Report which accompanied the 1982 amendments, a footnote on which the United States relies in this case: "In light of the amendment to section 2, it is intended that a section 5 objection also follow if a new voting procedure itself so discriminates as to violate section 2." *Id.* at 145, 103 S.Ct. at 1010 (quoting S.Rep. No. 97–417, 97th Cong., 2nd Sess. at 12, n. 31 (1982)). The majority in *Lockhart* noted that the district court had not ruled on the possibility that the 1982 amendments altered the substantive content of section 5 and therefore declined to review the question. *Id.,* 460 U.S. at 133 n. 9, 103 S.Ct. at 1003 n. 9.

We are unaware that any court has embraced the theory suggested by Justice Marshall and urged here by the defendant. Indeed, the Supreme Court has recently reaffirmed that section 2 and section 5 "differ in structure, purpose, and application" and that under section 5 "the proposed voting practice is measured against the existing voting practice to determine *whether retrogression would result* from the proposed change." *Holder v. Hall,* —— U.S. ——, ——, 114 S.Ct. 2581, 2587, 129 L.Ed.2d 687 (1994) (emphasis added). In light of this recent language, and because in 1982 Congress reenacted section 5 without change, we are not inclined to accept defendant's invitation to abandon the retrogression test which has been consistently applied by the Supreme Court since its original formulation in *Beer v. United States.* Because defendant concedes, and we agree, that the proposed addition of judgeships will not have a retrogressive effect, the only re-

maining question is whether the decision to add new judges was motivated by a discriminatory purpose.

### B. Discriminatory Purpose

■ In addition to the "effects" argument described above, defendant seeks to import section 2's substantive standards into preclearance inquiries by means of section 5's "discriminatory purpose" prong. Although the defendant recognizes that simply creating additional judges who will be elected in exactly the same manner as existing judges has no retrogressive effect, defendant does contend that the creation of the new judgeships was motivated by a discriminatory purpose. As described above,[4] defendant maintains that the system by which judges are elected in New York disadvantages minority voters in violation of section 2 of the Voting Rights Act.[5] Given the existence of this allegedly discriminatory system, defendant argues that the Court may infer a discriminatory motive on the part of the New York State legislature in adding the new judgeships: Since the New York State legislature is aware that the existing system of electing judges discriminates against minorities, and since the new judges will be elected in the same way as existing judges, it follows (according to defendant) that legislation creating the new judgeships must have been partly motivated by a discriminatory purpose. Thus, defendant argues that it is permissible—indeed that it is necessary—for this Court to analyze the existing system by which trial judges are elected in New York to determine whether the system violates section 2 of the Voting Rights Act, and if we conclude that the system is illegitimate, we should infer a discriminatory purpose on the part of the New York legislators. We are persuaded that such a section 2 inquiry is not warranted in a section 5 preclearance proceeding.

Defendant's argument may be summarized as follows. Defendant alleges that the man-

---

**4.** *See* note 2, *supra.*

**5.** A section 2 suit challenging the manner in which Supreme Court judges are elected is currently pending in the Southern District of New York, before Judge John E. Sprizzo. The United States has neither moved to intervene in that litigation nor brought its own action under section 2.

ner in which New York nominates and elects its trial court judges does not allow minority voters to participate on an equal basis with nonminorities, and that the New York legislature either knew or should have known that this was the case when it created the additional judgeships at issue here. Thus, defendant concludes that the New York legislature must have acted with a discriminatory purpose when it created additional judgeships that were to be filled pursuant to a preexisting, allegedly discriminatory system. According to the defendant, the New York legislature should have implemented a different method for nominating and electing the *new* judges in order to ensure that these judges not be elected according to a procedure (embodied in the existing electoral system) that allegedly violates section 2 of the Voting Rights Act. New York's failure to create such a new procedure for filling the new judgeships is, according to the defendant's argument, a sufficient basis for this Court to infer that the legislation creating the new judges was motivated by a discriminatory purpose. We reject this argument.

Admittedly, in an extreme case, evidence of a deliberate decision to extend an existing discriminatory scheme might create an inference of discriminatory intent. In *Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 563–64, 50 L.Ed.2d 450 (1977), a section 2 case, the Supreme Court counseled that

> Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of official action—whether it bears more heavily on one race than another—may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of state action even when the governing legislation appears neutral on its face.

*Id.* (internal citation and quotation marks omitted). There, however, the Court also noted that "such cases are rare," and declared that absent a stark pattern of racially discriminatory effects, "impact alone is not determinative, and the Court must look to other evidence." *Id.* (footnotes omitted).

At oral argument, counsel for the United States presented the Court with just such a stark situation by asking, hypothetically, whether legislation creating new state judges who would be elected according to an existing "whites only" voting scheme would be entitled to section 5 preclearance. While a state's decision to add new judgeships to such a blatantly discriminatory system might well create a sufficient inference of invidious purpose so as to preclude a grant of preclearance under section 5, defendant's allegations concerning the discriminatory effects of New York's existing electoral scheme do not. Defendant's allegations concerning New York's electoral system fall far short of portraying a starkly discriminatory scheme such as the one suggested by defendant's "whites only" hypothetical.

■ Nor does defendant's argument that New York legislators were (or should have been) aware that the existing electoral system might have a discriminatory effect give rise to an inference that the decision to create new judgeships had a discriminatory purpose. It is settled that discriminatory purpose

> implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.

*Personnel Administrator of Mass. v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979). Thus, under section 5's "purpose" analysis, the question is what *actually* motivated the legislators to make the changes for which they seek preclearance. Were we to accept defendant's theory that discriminatory intent may always be inferred from the existence of an allegedly discriminatory system, nearly every section 5 preclearance proceeding could potentially be transformed into full-blown section 2 litigation. We think a rule creating such a state of affairs both unwarranted and unwise. Moreover, as discussed below, we are convinced that New York's decision to create additional

judgeships was motivated by legitimate purposes, and that the existing electoral scheme provides no basis for inferring discriminatory intent.

A grant of preclearance under section 5 represents nothing more than an official determination that a proposed voting change will not diminish the position of minority voters and that it was not undertaken for a discriminatory purpose. Section 5 is quite clear that a proposed voting change is not immune from subsequent attack simply because it has received preclearance from this Court or from the Attorney General. 42 U.S.C. § 1973c. A voting scheme can always be challenged under section 2, notwithstanding the fact that certain changes to the system may have received preclearance under section 5. *E.g., United States v. East Baton Rouge Parish School Board,* 594 F.2d 56, 60 (5th Cir.1979).

■ To understand how this formulation of section 5 advances the goals of the Voting Rights Act, it is necessary to understand the relationship between section 5 and section 2. As the Supreme Court noted in *Beer,* section 5 was adopted in response to a tactic employed by certain jurisdictions which sought to avoid complying with the Act by passing new discriminatory voting laws whenever existing laws were struck down in section 2 litigation. *See Beer,* 425 U.S. at 140, 96 S.Ct. at 1363. Section 5 was designed to prevent this tactic by requiring covered jurisdictions to prove that any proposed changes to an existing voting scheme not have a discriminatory purpose or effect. Thus, "by freezing election procedures in the covered areas unless the changes can be shown to be nondiscriminatory," *id.* (internal quotations omitted), section 5 ensures that a plaintiff seeking to challenge an existing voting scheme in federal court under section 2 will have a stationary target to attack. It is both unnecessary and unwarranted for a court conducting a section 5 preclearance inquiry to attempt to evaluate the entire electoral scheme under the standards set forth in section 2. Thus, a section 5 court is concerned only with proposed *changes* to an electoral system; the question of the legitimacy of the system itself

is reserved for a court before which the issue is properly presented in a section 2 suit.

### III. Appropriateness of Summary Judgment

■ Since the defendant has conceded, and we agree, that the addition of new judges will not have a retrogressive effect, the question before the Court is whether New York has met its burden of proving that the decision to create these judgeships was not motivated in any way by a discriminatory purpose. We are satisfied that New York has carried its burden.

#### A. The Factual Showing

■ A plaintiff seeking preclearance under section 5 bears the burden of establishing the absence of discriminatory purpose. *See Busbee v. Smith,* 549 F.Supp. 494, 516 (D.D.C.1982), *aff'd mem.,* 459 U.S. 1166, 103 S.Ct. 809, 74 L.Ed.2d 1010 (1983). As a practical matter, this means that the plaintiff must come forward with evidence of legitimate, nondiscriminatory motives for the proposed changes to the voting laws. In addition, the plaintiff must furnish some affirmative evidence that the proposed changes were not motivated by a discriminatory purpose. Once the section 5 plaintiff has made such a showing, the burden shifts to the Attorney General, as the party resisting preclearance, to provide some evidence of a discriminatory purpose on the part of the legislators who seek to make the change. In the absence of such a showing, the section 5 plaintiff will be found to have carried its burden of establishing a lack of discriminatory purpose.

Turning to the facts of this case, it is clear that the plaintiff is entitled to prevail. The plaintiff has submitted numerous affidavits from New York State legislators and other officials involved with the administration of New York's voting laws, some of whom are themselves minorities. The statements contained in these affidavits reveal that the legislature's primary motivation for creating the additional judgeships was a desire to keep pace with a rapidly burgeoning docket which "strains all human capability to keep under control." Affidavit of E. Leo Milonas, ¶ 8. Obviously, a state's desire to ensure the effi-

cient administration of justice is a goal of paramount importance. New York's decision to apply existing election procedures to the new judgeships is unremarkable—the Supreme Court has recognized that a state has a legitimate interest in maintaining the continuity of an existing electoral system. *Houston Lawyers' Ass'n v. Attorney General of Texas,* 501 U.S. 419, 426–28, 111 S.Ct. 2376, 2381, 115 L.Ed.2d 379 (1991).

Furthermore, it appears that some legislators (including some minority legislators) believed that increasing the number of Supreme Court judges would actually *improve* the ability of minorities to gain access to the bench. *See, e.g.,* Affidavit of Clarence Norman ¶ 11.[6] Finally, many of the affidavits submitted by New York state legislators contain affirmative representations that the decision to create additional judgeships was not motivated by any discriminatory purpose. *E.g.,* Affidavits of Helene Weinstein, Clarence Norman, and Roberto Ramirez. In a previous section 5 proceeding, this Court found such uncontested statements by state legislators sufficient to establish an absence of discriminatory purpose. *State of Texas v. United States,* 802 F.Supp. 481, 486 (D.D.C. 1992).

The defendant has failed to identify a single fact which would suggest that the decision to create additional judgeships was motivated by a discriminatory purpose. Instead, defendant relies upon its theory, described and rejected above, that this Court may *infer* discriminatory intent on the part of the legislators because of the fact that in creating these new judgeships, they chose to perpetuate a voting scheme which defendant believes is discriminatory. The defendant is perfectly correct in arguing that discriminatory intent may be inferred from circumstantial evidence, including "[e]vidence of historical discrimination," *Busbee,* 549 F.Supp. at 517 (quoting *Rogers v. Lodge,* 458 U.S. 613, 625,

102 S.Ct. 3272, 3279–80, 73 L.Ed.2d 1012 (1982)); however, defendant offers not one single piece of evidence which suggests that *this particular decision*—that is, the decision to add new trial court judges who will be elected in the same way as existing judges— was *itself* motivated by a discriminatory purpose.

Indeed, during oral argument, counsel for the defendant was asked repeatedly by members of this Court what information the United States had (or would be able to develop with additional discovery) that would reveal invidious intent on the part of the plaintiff. Each time, counsel responded with facts and arguments pertinent to New York's *existing voting system,* but never with facts concerning the specific decision to create new judgeships.

It is quite clear that defendant's real complaint is that New York's decision to create the additional judgeships was not a step towards ameliorating what defendant perceives to be a discriminatory electoral system. Defendant argues that at the time the decision was made to create these new judgeships, New York state legislators knew or should have known that the State's system of electing trial court judges was discriminatory.[7] Thus, any change in the voting laws which fails to mitigate the effects of this inequality to defendant's satisfaction must, *ipso facto,* be animated by a discriminatory purpose. As existing case law makes abundantly clear, however, there is absolutely no requirement that proposed changes to voting laws place minority voters in a *better* position relative to the existing system. *See Lockhart,* 460 U.S. at 134, 103 S.Ct. at 1004; *Beer,* 425 U.S. at 141, 96 S.Ct. at 1363–64; *see also Ketchum v. Byrne,* 740 F.2d 1398, 1402 n. 2 (7th Cir. 1984), *cert. denied sub nom. City Council of the City of Chicago v. Ketchum,* 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985);

---

**6.** It appears that the results of the November 8, 1994 election support this belief. In New York, incumbent judges are reelected almost without exception. Four of the twelve judgeships at issue in this proceeding were held by incumbents. Thus, only eight of the twelve judgeships were truly "up for grabs" in the November 8 elections. Of these eight judgeships, however, four were won by minority candidates.

**7.** New York vigorously disputes the contention that its system is discriminatory, and, as noted above, the issue is currently being litigated in a section 2 proceeding in the Southern District of New York.

*State of Mississippi v. United States,* 490 F.Supp. 569, 583 (D.D.C.1979), *aff'd,* 444 U.S. 1050, 100 S.Ct. 994, 62 L.Ed.2d 739 (1980). Defendant's contention that it has raised material facts suggesting the existence of a discriminatory purpose rests entirely upon the proposition that the legitimacy (under section 2) of New York's existing electoral scheme is an issue before this Court. Since we have concluded that it is not, we find that the defendant has failed to raise an issue of material fact as to whether New York's decision to create additional judgeships was motivated by a discriminatory purpose.

Defendant maintains that even if the Court rejects its legal argument, New York's summary judgment motion should be denied because there has been no discovery in this action and because summary judgment is generally inappropriate for issues of intent. We are mindful of the serious concerns raised by these arguments; however, we are convinced that the unique circumstances of this case provide ample basis for the Court's decision to grant summary judgment.

### B.  Further Discovery

■ First, while it may technically be true that there has been no discovery "in this action," the defendant has been requesting and receiving information concerning the proposed creation of new judgeships from the State of New York for almost a year as part of an administrative preclearance proceeding. New York has furnished the Court with a detailed list describing the volumes of information it has sent the defendant as part of this administrative preclearance procedure. Although it is true that Justice Department lawyers have not had the opportunity to conduct formal depositions of New York State legislators, at oral argument New York's Attorney General informed the Court that defendant was given a waiver which permitted defendant's lawyers to speak with and obtain statements from any state official. Notably, the defendant's submissions to this Court did in fact contain statements from various New York officials, including legislators. Thus, it appears that New York has made every effort to cooperate with defendant's numerous requests for information.

Defendant's assertion that it lacks sufficient information to evaluate the proposed addition of judges is dubious for other reasons as well. First, on December 5 of this year the Assistant Attorney General sent the State of New York a letter formally denying administrative preclearance for the laws creating the new judgeships and describing in great detail her basis for concluding that the proposed legislation did not pass muster under section 5.[8]  Second, during oral argument the Court asked counsel for the United States what further discovery would be necessary in the event this Court rejected its theory that section 2 issues were relevant to this section 5 proceeding. Counsel responded that should this Court reject defendant's section 2/section 5 theory, no further discovery would be necessary. For these reasons, we think defendant's argument that it must be given a further opportunity to conduct discovery insupportable.

### C.  Summary Judgment on Issues of Intent

■ Defendant correctly notes that "[a]n inquiry into purpose or intent is particularly unsuited for resolution by summary judgment." *State of Texas v. United States,* No. 94–46, mem. op. at 15 (D.D.C. Oct. 20, 1994). However, this general rule does not operate to completely relieve the defendant of the burden of identifying some evidence of discriminatory intent on the part of New York State legislators. A party resisting summary judgment is "required to provide evidence that would permit a reasonable jury to find" in its favor. *Laningham v. U.S. Navy,* 813 F.2d 1236, 1242 (D.C.Cir.1987). As discussed above, defendant's factual allegations pertain to its argument that discriminatory purpose can be inferred from the legislature's decision to add judges to an electoral system which is allegedly illegitimate under section 2. Despite several queries from this Court during oral argument, defense counsel was unable to identify even a scintilla of evidence, not related to defendant's section 2/section 5 theory, which would support a finding of discriminatory intent. Accordingly, this

---

8.  *See* note 2, *supra.*

Court finds that defendant has failed to establish a genuine issue as to any *material* fact. New York, therefore, is entitled to judgment as a matter of law that its decision to create the additional judgeships at issue in this proceeding does not have the purpose and will not have the effect of denying or abridging the right of racial minorities to vote.

## IV. Conclusion

For the forgoing reasons, plaintiff's motion for summary judgment will be GRANTED in a separate Order issued this date.

For the court, Circuit Judge BUCKLEY and District Judge FRIEDMAN, concurring.

### *ORDER*

Plaintiff State of New York having moved for summary judgment upon plaintiff's complaint, which seeks a declaratory judgment pursuant to section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c, that Chapter 500 of New York Laws of 1982, Chapter 209 of New York Laws of 1990, and Chapter 440 of New York Laws of 1994, insofar as they create new judgeships on the New York State Supreme Court, do not have the purpose and will not have the effect of denying or abridging the right to vote on account of race, color, or language minority group status, it is hereby

ORDERED that plaintiff's motion is GRANTED; and it is further

ORDERED, ADJUDGED AND DECLARED that Chapter 500 of New York Laws of 1982, Chapter 209 of New York Laws of 1990, and Chapter 440 of New York Laws of 1994, insofar as they create new judgeships on the New York State Supreme Court, do not have the purpose and will not have the effect of denying or abridging the right to vote on account of race, color, or language minority group status under section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c.

FOR THE COURT, SO ORDERED