MEXICAN AMERICAN BAR ASSOCIA-
TION OF TEXAS (MABA)
(Statewide), et al., Plaintiffs,

v.

The STATE OF TEXAS, Defendant,

and

Faith Johnson, et al.,
Defendants–Intervenors.

UNITED STATES of America, Plaintiff,

v.

STATE OF TEXAS, et al., Defendants.

Nos. MO–90–CA–171, A–90–CA–1018.

United States District Court,
W.D. Texas,
Midland–Odessa Division.

Dec. 26, 1990.

Rolando L. Rios, San Antonio, Tex., William L. Garrett, Brenda Hull Thompson, Garrett, Thompson & Chang, Dallas, Tex., for plaintiffs.

Robert H. Mow, Jr., Bobby M. Rubarts, David C. Godbey, Hughes & Luce, Dallas, Tex., for intervenors-plaintiffs.

John R. Dunne, J. Gerald Hebert, Poli A. Marmolejos and Jennifer Cass, for U.S.

Renea Hicks, Javier P. Guajardo, Atty. Gen.'s Office, Austin, Tex., for defendant.

Paul C. Isham, Decker, Jones, McMackin, McClane, Hall & Bates, Ft. Worth, Tex.

Walter H. Mizell, Brown, Maroney, Rose, Barber & Dye, Austin, Tex.

John H. Coates, Brown Maroney & Oaks Hartline, Austin, Tex.

David R. Richards, Austin, Tex.

Before JERRY E. SMITH, Circuit Judge, LUCIUS DESHA BUNTON, III, Chief District Judge, and WALTER S. SMITH, Jr., District Judge.

## MEMORANDUM OPINION AND ORDER

In this consolidated case we sit as a special three-judge court pursuant to section 5 of the Voting Rights Act of 1965 (the "Act"), 42 U.S.C. § 1973c. The private plaintiffs in one action (No. MO–90–CA–171) and the United States in the other (No. A–90–CA–1018) ask us to enjoin the implementation, or continuing implementation, of certain alleged voting changes affecting the selection of state district judges in several designated counties in Texas. We conclude that as a matter of law the plaintiffs are entitled to no relief.

### I.

For the sake of simplicity, we consider the challenged judgeships in two groups: (1) the Travis County judgeships and (2) the judgeships in what we will term the "other challenged counties," which include the Texas counties of Dallas, Lubbock, Tarrant, and Victoria. Our basis for denying relief differs between the two groups, as their legal status is dissimilar. As to both groups, the plaintiffs challenge the continuing implementation of county-wide voting for multiple state district judge positions within each of the subject counties. They assert that the at-large election of state district judges is in violation of section 2 of the Voting Rights Act, 42 U.S.C. § 1973.

The United States Court of Appeals for the Fifth Circuit recently has held that section 2 does not apply to the election of judges. *See League of United Latin American Citizens Council No. 4434 v. Clements*, 914 F.2d 620, 622 (5th Cir.1990) (en banc) (overruling *Chisom v. Edwards*, 839 F.2d 1056 (5th Cir.), *cert. denied*, 488 U.S. 955, 109 S.Ct. 390, 102 L.Ed.2d 379 (1988)), *petition for cert. filed sub nom. Houston Lawyers' Ass'n v. Mattox*, 59 U.S. L.W. 3406 (U.S. Nov. 21, 1990) (No. 90–813). Based at least in part, if not entirely, upon its view that it is not bound by that decision (hereinafter *"LULAC"*), the Attorney General of the United States on November 5, 1990, interposed an objection to the implementation of new district judgeships in the other challenged counties. The objection was interposed pursuant to the Attorney General's conclusion that the State of Texas had not carried its burden, under section 5, of showing that the new judgeships would not violate section 2.

A few days earlier, on October 26, 1990, the private plaintiffs had filed the instant

complaint in No. MO–90–CA–171. They assert that the new judgeships in the other challenged counties may not be implemented because, *inter alia*, they have not been precleared, allegedly as required by section 5, by either the Attorney General or the United States District Court for the District of Columbia.

Additionally, the private plaintiffs assert that two district judgeships in Travis County have not received preclearance as required. The private plaintiffs seek an injunction proscribing all further elections in Travis County and the other challenged counties until preclearance is obtained.

Following the Attorney General's interposition of an objection as to the other challenged counties on November 5, the United States filed the instant complaint in No. A–90–CA–1018, seeking to enjoin the implementation of the asserted voting changes in the other challenged counties. The United States and the Attorney General now contend, as well, that the Travis County judgeships were subject to preclearance requirements, were not precleared, and now should be submitted for preclearance.

## II.

We conclude that creation of the Travis County judgeships at issue here is not subject to the preclearance requirement of section 5. The judgeships in question are the 200th and 201st judicial district courts, which were added to Travis County by S.B. 515, which bill was signed by the governor on June 1, 1971, and became effective on August 20, 1971. The bill created the 200th judicial district court effective September 1, 1971, and the 201st effective January 1, 1973.

Section 5 was not applicable to Texas at that time, but the state became a covered jurisdiction on August 6, 1975, by operation of Pub.Law No. 94–73, the 1975 amendments to the Act. Section 204 of the enactment, 89 Stat. 402, added language to section 5 to require preclearance as to "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1972".

■ Thus, in order to be a covered change, an electoral change in Texas must be different from one in "force or effect" as of November 1, 1972. S.B. 515 was in effect long before that date and has remained unchanged thereafter. The effective date of the law, not the dates on which the respective judgeships were first filled through appointment or election, are determinative for purposes of section 5.

At least one three-judge voting rights court in Texas has so held. In *Hereford Indep. School Dist. v. Bell*, 454 F.Supp. 143, 145 (N.D.Tex.1978) (three-judge court), the court explained that preclearance was required for election procedures *"enacted after November 1, 1972."* [Emphasis added.] The same conclusion was suggested by the Supreme Court in *Briscoe v. Bell*, 432 U.S. 404, 413 n. 12, 97 S.Ct. 2428, 2433 n. 12, 53 L.Ed.2d 439 (1977), which noted that as to Texas, the 1975 amendments established November 1, 1972, as "the precise date at which a coverage determination becomes effective, thereby requiring, for example, preclearance of any laws affecting voting rights *after* that date." [Emphasis added.]

The applicable test was enunciated in *City of Lockhart v. United States*, 460 U.S. 125, 103 S.Ct. 998, 74 L.Ed.2d 863 (1983). The Court observed that in ascertaining whether a change has a proscribed effect, "[t]he proper comparison is between the new system and the system actually in effect on November 1, 1972...." *Id.* at 132, 103 S.Ct. at 1003. Quoting *Perkins v. Matthews*, 400 U.S. 379, 394, 91 S.Ct. 431, 439, 27 L.Ed.2d 476 (1971), the *Lockhart* court noted that " '§ 5's reference to the procedure "in force or effect on November 1, 19[72]," must be taken to mean the procedure that would have been followed if the election had been held on that date.' "

Here, the "system actually in effect on November 1, 1972," included the existing 200th and 201st district courts. A judge had been gubernatorially appointed to the 200th court in August 1971, and primary elections were conducted in the spring of

1972. Although the general election was held within a few days after November 1, 1972, absentee balloting was well underway by that date. A judge was gubernatorily appointed to the 201st court in January 1973. The primary and general elections were conducted, respectively, in the spring and fall of 1974.

Under the reasoning in *Perkins*, if a hypothetical election had been conducted for the 200th and 201st courts on November 1, 1972, it would have been conducted under the system in place prior to that date, which included the existing two courts in question. Thus, we conclude that the date of enactment, rather than the dates of the first elections for the respective two courts, is the appropriate date by which to determine applicability of section 5.

We also observe that looking to the date of enactment is consistent with the posture taken by the Attorney General concerning the questioned judgeships in the other challenged counties. In his letter of November 5, 1990, the Attorney General interposed objection to the changes effected by the *enactment* of the bill creating those courts. The Attorney General cannot have it both ways: If enactment is the operative event for purposes of the judgeships in the other challenged counties, the same must be true for the Travis County judgeships, as well. Hence, we deny all relief as to the Travis County judgeships.

### III.

We conclude that creation of the questioned judgeships in the other challenged counties was precleared by operation of law, assuming *arguendo* that the creation of new judgeships such as those at issue is subject to section 5's preclearance requirement. The judgeships being challenged herein in the other challenged counties were created by S.B. 1379, which was signed by the governor on June 14, 1989, and established the judgeships effective September 1, 1989. The bill created fifteen judgeships, which are set forth in the margin.[1]

Section 5 permits a covered jurisdiction, such as Texas, to seek preclearance of electoral changes either by filing a declaratory judgment action in the United States District Court for the District of Columbia or by submitting the changes to the Attorney General. By the specific terms of section 5, a submitted change is deemed precleared as a matter of law if "the Attorney General has not interposed an objection within sixty days after such submission."

The Attorney General has promulgated regulations designed to implement the preclearance contemplated by section 5. *See* 28 C.F.R. ch. 1 pt. 51, "Procedures for the Administration of Section 5 of the Voting Rights Act of 1965, as Amended." The regulations reiterate the provision in section 5 that a matter is deemed precleared if not objected to by the Attorney General within sixty days. 28 C.F.R. § 51.1(a)(2) (1990).

During the sixty-day period, the Attorney General may, *by letter*, request "any omitted information considered necessary for the evaluation of the submission." *Id.* § 51.37(a). Significantly, "[w]hen a submitting authority provides documents and written information *materially supplementing* a submission ..., the 60–day period ... will be calculated from the receipt of

---

1.

| Court | County(ies) | Challenged |
|-------|-------------|------------|
| 363rd | Dallas | Yes |
| 364th | Lubbock | Yes |
| 365th | Dimmitt, Maverick, Zavala | No |
| 366th | Collin | No |
| 367th | Denton | No |
| 368th | Williamson | No |
| 369th | Anderson, Cherokee | No |
| 370th | Hidalgo | No |
| 371st | Tarrant | Yes |
| 372nd | Tarrant | Yes |
| 373rd | Tarrant | No |
| 374th | Tarrant | No |
| 375th | Tarrant | No |
| 376th | Tarrant | No |
| 377th | Victoria | Yes |

For purposes of the present request under § 5 for injunctive relief, only those judgeships marked "Yes" under the "Challenged" column are being questioned by the plaintiffs. The 373rd, 374th, 375th, and 376th courts do not

the supplementary information...." *Id.* § 51.39(a) (emphasis added).

■ The State of Texas asserts that S.B. 1379 was precleared by operation of law in that sixty days had elapsed from its initial submission without either (1) the interposition of an objection or (2) the submission of "materially supplementing" information. We agree and, hence, deny all relief as to the judgeships in the other challenged counties.

The state submitted S.B. 1379 to the Attorney General on February 13, 1990; the sixtieth day for interposing an objection was April 16, 1990. During the period between February 13 and April 16, the state provided no additional material, with one exception.

On March 23, following a telephone conversation with an employee of the United States Department of Justice (DOJ), the state telecopied a copy of Tex. Const. art. V, §§ 7 and 7a, to the Voting Rights Section of the Civil Rights Division of the DOJ. Each of those constitutional sections had been precleared by the Attorney General by letter dated October 1, 1985.

By letter dated April 11, the Attorney General's office notified the state that supplemental information had been received and that, consequently, the deadline for objection had been extended to May 22. The letter did not assert that the additional information constituted a *material* supplement.

Between March 23 and May 22, the state furnished no additional material, with one exception. By letter dated May 16, referencing a telephone conversation with a DOJ employee, the state, by letter to that employee, requested that she consider, in regard to the submission of S.B. 1379, the panel opinion in *LULAC*, 902 F.2d 293 (5th Cir.1990) (declaring section 2 inapplicable to multi-member, county-wide judgeships), and the then-anticipated en banc opinion (which in fact was issued the following September).

By letter dated May 18, the Attorney General's office notified the state that by virtue of the state's May 16 letter, the

deadline for objection had been extended to July 16 (the sixtieth day after May 16). Then, following the en banc oral arguments in *LULAC* that occurred on June 19, 1990, the state, by letter dated July 2, 1990, purported to withdraw its submission of S.B. 1379. Immediately following issuance of the en banc opinion in *LULAC* on September 28, 1990, the state on October 2 resubmitted S.B. 1379 to the Attorney General, requesting preclearance

We hold that neither the telecopy of March 23, 1990, nor the letter of May 16, 1990, constitutes a material supplemental submission necessary to extend the sixty-day period provided to the Attorney General for interposing an objection. If the March 23 telecopy thus did not start the sixty-day period running anew, S.B. 1379 was precleared by operation of law on April 16, 1990. Assuming *arguendo* that the March 23 telecopy was a material supplemental submission, the sixty-day period nevertheless expired on May 22, as the letter of May 16 was not a material supplemental submission.

■ The assertion that the telecopying of two sections from the Texas constitution started the sixty-day period running anew is entirely without merit. Those constitutional sections were available as published legal materials in any reasonably complete law library; the DOJ does not argue that it had no easy access to the same. Moreover, the sections had been precleared by the Attorney General several years previously. They were not at issue, directly or indirectly, in the submission of S.B. 1379.

Facts are "material" if they "might affect the outcome ... under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). There is no respect in which the submission to the Attorney General of a copy of readily available provisions, of which the Attorney General was well aware and which already had received the close scrutiny of the preclearance process, possibly could have "affected the outcome" of the submission of S.B. 1379.

Additionally, section 51.39(a) of the regulations, discussed *supra,* requires that in

exist, although nominally authorized by S.B. 1379, as the statutory conditions necessary to

bring them into existence have not been met.

order to re-start the sixty-day period, the new documents must be "materially supplementing" the initial submission. Even assuming *arguendo* that the documents here were "material," they cannot reasonably be deemed to have "supplemented" the submission of S.B. 1379. As we have observed, the Attorney General already knew of the constitutional sections, had ready access to them, and had precleared them. The mere sending of copies of them to the DOJ did not add to, or supplement, anything.

Finally, section 51.37(a) of the regulations, discussed *supra*, requires that any additional information needed by the Attorney General must be requested "by letter." It is acknowledged that the sections of the Texas constitution, if requested at all, were asked for by telephone. In summary, then, the March 23 telecopy did not trigger a new sixty-day period, and S.B. 1379 was precleared by operation of law on April 16.

■ Assuming *arguendo* that a new sixty-day period began running on March 23, it expired on May 22, and the state's letter of May 16 cannot be deemed a "materially supplementing" submission. The May 16 letter merely called the DOJ's attention to the pendency of the *LULAC* case. But that information did not "supplement" anything.

As of May 16, the DOJ was participating actively as amicus curiae in *LULAC,* in which oral argument was presented before the Fifth Circuit panel on April 30, with a panel opinion issued on May 11. *See LULAC,* 902 F.2d 293 (5th Cir.1990). On May 16, the court entered its order granting rehearing en banc in *LULAC. See LULAC,* 902 F.2d 322, 323 (5th Cir.1990). The DOJ participated in briefing and oral argument before the en banc court.

Thus, the DOJ was aware of, and was a part of, every phase of the *LULAC* litigation during the time when S.B. 1379 was under submission. The DOJ was undeniably cognizant of the fact that both *LULAC* and S.B. 1379 involved the question of at-large voting for district judges in Texas. A letter asking the DOJ to consider *LULAC* in reviewing S.B. 1379 thus certainly

was not "material" and could not have "supplemented" any information or knowledge that the DOJ or the Attorney General already had.

Accordingly, the mere sending of the May 16 letter did not trigger a new sixty-day period under section 51.39(a). The sixty-day period, even if started anew on March 23, expired on May 22, and consequently, in the alternative, was precleared by operation of law on May 22. The purported withdrawal of the submission on July 2 had no legal effect, as by operation of law the preclearance had already occurred, and the state was free to implement the electoral changes, if any, encompassed by S.B. 1379.

Finally, as to the letter of May 16, we note that the Attorney General apparently never deemed the *LULAC* litigation material, in any event, for purposes of the preclearance of S.B. 1379. That is evident from the fact that, despite the Fifth Circuit's en banc conclusion that section 2 does not apply to the election of judges, the Attorney General, in his letter of November 5 interposing an objection to S.B. 1379, acknowledged the *LULAC* en banc opinion but declined to follow it. Instead, the November 5 letter declares that "use of the at-large election sytem [sic] with numbered posts and majority vote results in a clear violation of Section 2. . . ."

Hence, for this additional reason, the *LULAC* litigation, from the Attorney General's point of view, was not a "material" or "supplemental" submission that, under section 51.39(a), could have triggered a new sixty-day period for the interposition of objections. Therefore, S.B. 1379 has been precleared by operation of law, and thus the prerequisites for an injunction under section 5 have not been satisfied.

## IV.

We close by expressing our concern at the actions taken, and the position expressed, by the Attorney General and DOJ in this matter. Texas is within the geographical jurisdiction of the Fifth Circuit. On September 28, 1990, in *LULAC,* that

court, sitting en banc, declared, by a margin of 12–1, that section 2 does not apply to at-large, numbered-post, multi-member elections of district judges in Texas. By a margin of 7–6, the court declared that the election of judges, in general, is not within the ambit of section 2.

Despite this plain ruling, the Attorney General, in his letter of November 5, interposed an objection to S.B. 1379 solely on the basis of his contention that "use of the at-large election sytem [sic] with numbered posts and majority vote results in a clear violation of Section 2...." During oral argument in the instant matter, the DOJ has asserted that it does not consider itself bound by the *LULAC* decision, even as to electoral changes in the three states encompassing the Fifth Circuit.

This position reflects a disturbing disregard for the rule of law. The Attorney General is not merely preserving, as an advocate, an issue for possible later resolution by the Supreme Court. Instead, he has taken official action, by interposing an administrative objection, that is based solely upon a ground definitively rejected as the law in the Fifth Circuit. The DOJ participated actively in the *LULAC* litigation and now, having lost, seeks to assert its view by ignoring the law of the circuit.

The aim of the United States here is salutary—to effect the laudable goals of the Act by opposing changes that, in the view of the Attorney General, have the purpose or effect of diminishing the role of minorities in the electoral process. However, as the instant action is brought under the Act, both this court and the Attorney General are limited to the role assigned by Congress in passing the Act.

 The circuit court by which this district court is bound (absent Supreme Court directive) has declared that section 2 does not apply to the election of judges.

The United States, as a litigant in this court, is bound by that determination. Likewise, it may not wield its administrative sword in this circuit in contravention of the interpretation of the Act enunciated by the Fifth Circuit (again, absent any intervening declarations by the Supreme Court).[2]

The orderly administration and enforcement of the Voting Rights Act must be based upon the rule of law, as enacted by Congress and interpreted by the courts. In our dark past, minority rights were abrogated by defiant state officials who refused to accept the rule of law, as declared by the federal courts. That era, fortunately, has passed. We merely observe that the commendable objectives of the Voting Rights Act can be achieved, as well, only through adherence to the orderly, albeit sometimes time-consuming, process of court interpretation, to which the United States, like the states and private parties, is subject.

## V.

In summary, no preclearance was required for S.B. 515, and S.B. 1379 was precleared by operation of law. Hence, the requirements for injunctive relief under section 5 have not been met.[3] We deny all relief. It is so ordered.

JERRY E. SMITH, Circuit Judge, and WALTER S. SMITH, Jr., District Judge, concur.

LUCIUS DESHA BUNTON, Chief District Judge, concurring in part and dissenting in part.

I concur in the part of the majority's opinion that finds the Travis County judgeships, i.e., the 200th and 201st District Courts are not subject to the preclearance requirements of Section 5. I dissent from the part of the opinion that the questioned

---

**2.** We also observe that the result of the Attorney General's position here, if allowed to prevail, is somewhat mixed. One of the challenged judgeships involves a black female elected in 1990 in Dallas County; another challenge, in Tarrant County, would bring about the removal from the bench of an Hispanic male who has served as a state judge for many years.

**3.** *See also Hunter v. City of Monroe,* 757 F.Supp. 25 (W.D.La.1990) (three-judge court) (holding that § 5 does not apply to the mere addition of judgeships to an existing judicial structure).

judgeships in the other challenged counties were precleared by operation of law. This is incorrect, because it is contrary to the facts that were presented to the Court and, further, is incorrect under the law for the reasons hereinafter set forth.

This is an action pursuant to the Voting Rights Act of 1965, 42 U.S.C. 1973c as amended in 1982, 42 U.S.C. Sections 1983 and 1988, and the Thirteenth, Fourteenth and Fifteenth Amendments to the Constitution of the United States, challenging the failure of the State of Texas to preclear, pursuant to the Voting Rights Act, the creation of seven State District Judgeships in Texas.[4] This hearing is limited to consideration of the Voting Rights issue.

Section 5 of the Voting Rights Act provides that whenever a political subdivision seeks to "administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1972", it must obtain preclearance either from a United States District Court in the District of Columbia or the Attorney General. If preclearance is sought from the Attorney General and he tenders no objection within sixty days, the submission is precleared by operation of law.[5] However, if the submitting authority provides "supplementary information" for evaluation, the sixty day period is recalculated from receipt of the supplementary information.[6] Texas, as a covered jurisdiction under this section[7], must seek preclearance of electoral changes in accordance with the section's provisions.

Five of the seven challenged judgeships were created by S.B. 1379,[8] which was passed by the Texas legislature in its 1989 regular session and signed by the Governor on June 14, 1989. Texas submitted S.B. 1379 to the Attorney General for preclearance on February 13, 1990. The Attorney General's deadline for interposing an objection was April 16, 1990. On March 20th, Texas telecopied two sections of the Texas Constitution (Sections 7 and 7a of Article 5) to the Voting Rights Section of the Civil Rights Division of the Department of Justice ("DOJ") following a telephone conversation with a DOJ employee. Upon receipt of this supplementary information, the Attorney General extended the objection deadline to May 22, 1990.

On May 16, 1990, Texas submitted a letter to the Attorney General requesting that its submission be considered in accordance with the Fifth Circuit's panel decision and anticipated en banc decision in *LULAC Council No. 4434 v. Clements*. Thus, the Attorney General extended the objection deadline to July 16, 1990.

After en banc arguments in *LULAC*, Texas withdrew its submission of S.B. 1379 in a letter dated July 2, 1990. Following the en banc decision in *LULAC*, Texas resubmitted S.B. 1379 on October 1, 1990.

On November 5, 1990, the Attorney General interposed its objection to Texas' voting changes promulgated by S.B. 1379, noting that Texas failed to meet its burden of establishing that the submitted changes have neither a discriminatory purpose nor a discriminatory effect.

This Court must determine three main issues: Is Section 5 of the Voting Rights Act applicable to the contested judgeships? If so, did Texas properly obtain preclearance? Finally, if a violation of Section 5

---

**4.**

| COURT | COUNTY |
|-------|--------|
| 363rd | Dallas |
| 364th | Lubbock |
| 371st | Tarrant |
| 372nd | Tarrant |
| 377th | Victoria |
| 200th | Travis |
| 201st | Travis |

**5.** See 42 U.S.C. § 1973c.

**6.** 28 C.F.R. § 51.39(a) (1990).

**7.** See 28 C.F.R. Pt. 51, Appendix (1990) (Texas has been a "covered jurisdiction" since September 23, 1975).

**8.** The 200th and 201st District Courts in Travis County were added by S.B. No. 515, which was signed by the Governor on June 1, 1971, and became effective August 30, 1971. Section 1 of the bill created the 200th judicial district effective September 1, 1971, and the 201st effective January 1, 1973.

does exist, what is the appropriate remedy?[9]

### Does Section 5 Apply to S.B. 1379?

Yes.

Since September 23, 1975, Texas has been a "covered jurisdiction" under Section 5 of the Voting Rights Act.[10] The Act requires preclearance when a State seeks to administer any "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting ...".[11] Notably, this section applies itself to all "voting", and imposes no limitation on who or what is the subject of the voting. In fact, the Supreme Court summarily affirmed two cases which found that judicial elections are submit to the requirements of Section 5.[12] Although Texas argues "that Section 5 does not apply to the changes that are the subject of the plaintiffs' challenge because judicial elections in general are not covered by Section 5",[13] it goes on to add, "Texas understands that this Court is bound by the Supreme Courts summary affirmances in two cases in which these legal arguments were rejected."[14] Thus, Texas does not dispute the applicability of Section 5 in this instance; it merely argues S.B. 1379 has met the preclearance requirements contained in the section.

### Did Texas properly obtain preclearance of S.B. 1379 pursuant to Section 5?

No.

Under Section 5, Texas could pursue either of two options in obtaining preclearance of voting changes: Submit its preclearance request to a District Court in the District of Columbia, or submit them to the Attorney General. Texas opted for the latter, and submitted S.B. 1379 for preclearance February 13, 1990. Accordingly, the Attorney General had sixty days, or until April 16, 1990, to interpose an objection.

Within this period (on March 20th), Texas telecopied two sections of the Texas Constitution (Sections 7 and 7a of Article 5) to the Voting Rights Section of the Civil Rights Division of the Department of Justice. According to 28 C.F.R. § 51.39, submission of "supplementary information" extends the deadline. Thus, the new deadline became May 22, 1990.[15]

Within this new period (on May 16th), Texas submitted supplementary information to the Attorney General in the form of a letter requesting that its preclearance request be considered in accordance with *LULAC*.[16] This resulted in extension of the objection deadline to July 16, 1990.[17]

---

**9.** See *McCain v. LyBrand*, 465 U.S. 236, 250, n. 17, 104 S.Ct. 1037, 1046, n. 17, 79 L.Ed.2d 271, 282, n. 17 (1984) ("The only questions in an action alleging a violation of the § 5 preclearance requirement are (1) whether a change is covered by § 5, (2) if the change is covered, whether § 5's approval requirements have been satisfied, and (3) if the requirements have not been satisfied, what relief is appropriate."); *Lockhart v. United States*, 460 U.S. 125, 129, n. 3, 103 S.Ct. 998, 1001, n. 3, 74 L.Ed.2d 863 (1983).

**10.** 28 C.F.R. Pt. 51, Appendix (1990).

**11.** See 42 U.S.C. § 1973(c).

**12.** *Brooks v. State Board of Elections*, No. CV 288–146, 1989 WL 180759 (S.D.Ga. Dec. 1, 1989), *modified* (May 29 and June 25, 1990), *aff'd mems.*, — U.S. —, 111 S.Ct. 288, 112 L.Ed.2d 243, — U.S. —, 111 S.Ct. 288, 112 L.Ed.2d 243 (1990); *Haith v. Martin*, 618 F.Supp. 410 (E.D.N.C.1985), *aff'd mem.*, 477 U.S. 901, 106 S.Ct. 3268, 91 L.Ed.2d 559 (1986) ("We hold the fact that an election law deals with the election of members of the judiciary does not remove it from the ambit of section 5.")

**13.** Texas's Response to Plaintiffs' Motion to Enjoin Elections for Certain Unprecleared Judgeships, p. 13.

**14.** *Id.*

**15.** On April 16, 1990, Texas received the Attorney General's letter notifying Texas that "supplemental information was received on March 23 and 28, 1990." Thus, the deadline was extended to May 22, 1990.

**16.** On April 16, 1990, Texas received notification from the Attorney General that Texas' submission of supplemental information extended the objection deadline. Thus, when Texas chose to submit its second letter, it was fully aware that submission of supplemental materials would result in an extension of the existing deadline. Even so, Texas chose to submit the letter.

**17.** In a letter dated May 18, 1990, the Attorney General notified Texas of the new July 16, 1990 deadline, stating "[w]e received additional supplemental information regarding this submission on May 15 and 16, 1990."

Prior to the July 16th deadline, Texas withdrew its submission of S.B. 1379 in a letter dated July 2, 1990. To explain this action, Texas states, "[p]rior to this withdrawal, the 60th day for your response to this submission was July 16, 1990". Texas offers as its reason for withdrawal that "[i]t is thus not certain whether the court will issue its opinion (in *LULAC*) prior to July 16, 1990." Additionally, since a jurisdiction is only permitted to withdraw a submission prior to a final decision by the Attorney General,[18] Texas' actions in requesting and accepting withdrawal affirms its understanding that preclearance had not yet been achieved. Thus, Texas clearly acknowledges both that its preclearance request has not been decided by the Attorney General, and that its submission of "supplementary materials" extended the objection deadline to July 16, 1990. With this, Texas' first attempt at preclearance ended without a decision by the Attorney General.

On October 1, 1990, Texas sent a letter to the Attorney General resubmitting[19] its application for preclearance of S.B. 1379. The language in the letter very clearly states this is a resubmission of Texas' preclearance request, thus beginning another sixty day objection deadline.[20]

On November 5, 1990, which was well within the time frame for submission of objections, the Attorney General issued its opinion denying preclearance of S.B. 1379. Texas made no further attempts to obtain preclearance. Accordingly, it is clear that S.B. 1379 simply has not been precleared pursuant to Section 5 of the Voting Rights Act.

*What Remedy is Appropriate to Achieve Section 5 Compliance for S.B. 1379?*

Preclearance.

To achieve compliance with Section 5, Texas must obtain preclearance of S.B. 1379. "By the very terms of the statute, covered changes in election laws may not be put into effect until they have either been precleared by the Attorney General or approved by the United States District Court for the District of Columbia. Indeed, they are not 'effective as laws until and unless [they are] cleared pursuant to § 5.' "[21] Since the Attorney General refuses preclearance, the only remaining option lies with the United States District Courts for the District of Columbia. In my opinion, since Section 5 compliance is lacking, Texas must "institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color...."[22] In the interests of justice, preclearance must be sought within sixty days.

This leaves open the status of the unprecleared judgeships during the pendency of this process. The United States Supreme Court considered this situation in *Berry v. Doles*, 438 U.S. 190, 98 S.Ct. 2692, 57 L.Ed.2d 693 (1978). In that case, the three-judge panel found noncompliance with Section 5, enjoined further enforcement of the relevant statute, and ordered the State of Georgia to seek approval under Section 5 within thirty days. *Id.* at 192, 193, 98 S.Ct. at 2693, 2694. The Court stated, "If approval is obtained, the matter will be at an end." *Id.* at 193, 98 S.Ct. at 2694. I agree that in the interim of the preclearance process, the judges presiding in the 363rd, 364th, and 377th District Courts should continue in the operation of their courts, with full power and authority.[23] Since the

---

**18.** 28 C.F.R. § 51.25(a) (1990).

**19.** The specific wording in the letter is "This letter is to advise you that the State of Texas is hereby resubmitting its submission of Chapter 632, Senate Bill 1379, 71st Legislature, 1989." The Court sees no ambiguity in the language which would cause Texas to believe it was doing anything other than resubmitting its preclearance request, thus beginning another sixty day objection period.

**20.** See 28 C.F.R. § 51.39 (1990).

**21.** *Haith*, supra note 7, at 414.

**22.** See 42 U.S.C. § 1973c.

**23.** I commend the judges who preside over these Courts for their efforts in reducing the total caseload in their respective areas. I am fully aware that the existence of these Courts is certainly in the best interest of the public, and I

newly elected judges to the 371st and 372nd District Courts have not yet taken the oath and initiated proceedings in those Courts, the unprecleared judgeships in Districts 371 and 372 should remain vacant until preclearance is obtained. No affirmative action to certify unprecleared judgeships is appropriate.

In rendering this opinion, I note that I in no way wish to hinder the Legislature's efforts to create additional State District Courts. In fact, I recognize the imperative need for the judgeships created by S.B. 1379. I merely ask, as I must under the law, compliance with Section 5 of the Voting Rights Act.

I write also to commend the Department of Justice and the Attorney General. I do not believe for a minute that intervening in the *LULAC* case before the Fifth Circuit constituted any sort of a waiver on the part of the United States to continue to seek vigorous enforcement of the Voting Rights Act. The Attorney General is not ignoring the en banc decision. He is attempting to comply with the law as the Sixth Circuit has decreed and as he perceives the Voting Rights Act should be interpreted. Certainly, the Department of Justice has more things to do than monitor each Constitutional provision of the fifty states of the United States, each statute passed by those states, and the opinions of each district court and circuit court. All submissions in the case before this Court were relevant and material and, certainly, the State of Texas believed not only that preclearance had to be sought but that preclearance had not been obtained. It is inconceivable to me that the State of Texas would withdraw the submission if they thought as a matter of law or fact that the judgeships had been precleared. It is just as inconceivable to believe that the State would make a resubmission in October of 1990 if it felt that the matter had been precleared many months before. In my opinion, my two judicial

brothers who sat with me on this panel are patently wrong.

At the risk of making this opinion too long, I cannot help but believe that the en banc decision in *LULAC* was incorrect. As a District Judge in the Fifth Circuit, I am bound by the en banc opinion, and will abide by it until such time as the Supreme Court reverses the opinion or the Congress makes changes in the Voting Rights Act.

The majority opinion here seeks to salve its conscience by pointing out that two of the judges of the courts involved are minorities. Just because one of the judges is a black female and another a Hispanic male does not make the opinion correct. I have no quarrel with either of these individuals, and am sure they are both highly qualified and competent judges. The fact remains, however, that the Voting Rights Act does not speak to those holding the office, but rather speaks to the rights of voters. The voters in the respective districts of these two judges are, in my opinion, having their rights under the Act violated.

Shakespeare, in *Sonnet 35*, reflects my feelings about the current state of the law in the Fifth Circuit when it comes to the Voting Rights Act. He said:

> Roses have thorns, and silver fountains mud;
> Clouds and eclipses stain both moon and sun,
> And loathsome canker lives in sweetest bud.
> All men make faults.

The opinion in *LULAC* is indeed a thorn in the flesh of voters. The silver fountain of Voting Rights does indeed contain mud. This stains both moon and sun and is indeed a sore on one of the sweetest rights guaranteed by our Constitution. In the opinion of this writer, the *LULAC* en banc decision is reminiscent of the infamous *Dred Scott* decision,[24] which deprived many people of their rights and led to our most unfortunate historic conflict.

---

in no way wish to impede the progress of State District Judges.

**24.** In *Dred Scott v. Sandford,* 19 How. 393, 394, 15 L.Ed. 691 (1857) the Supreme Court stated, "The plaintiff having admitted, by his demurrer to the plea in abatement, that his ancestors were imported from Africa and sold as slaves, he is not a citizen of the state of Missouri according to the Constitution of the United States, and was not entitled to sue in that character in the Circuit Court."

I would hope that the Supreme Court of the United States will recognize this as a most important field of the law that needs their interpretation. It is hard to believe that the voters in Mississippi, Louisiana, and Texas are afforded less rights than voters in the States that are in the Sixth Circuit, i.e., Kentucky, Michigan, Ohio, and Tennessee.

If the Supreme Court does not soon give us guidance, some citizens are going to be deprived of their Constitutional and statutory voting rights.

I DISSENT.