## CONCERNED CITIZENS FOR EQUALITY,

v.

### John McDONALD, et al.

No. 92–CV–241.

United States District Court, E.D. Texas, Beaumont Division.

Sept. 29, 1994.

Louis Dugas Jr., Orange, TX, H.D. Pate, Bridge City, TX, for plaintiff.

John P. Kimbrough, Donald B. Kelley, Orange, TX, for defendant.

### *OPINION ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT*

HINES, United States Magistrate Judge.

This civil action for declaratory and injunctive relief challenges Orange County, Texas's procedures for electing justices of the peace and constables. The four-precinct, single member structure is alleged to violate federal constitutional and statutory requirements prohibiting discrimination on account of race. The principal remedy sought is an injunction that requires creation of a fifth justice precinct in a portion of the county where black citizens are concentrated.

Cross motions for summary judgment are pending.

### I. NATURE OF THE CASE; PROCEEDINGS TO DATE

This lawsuit was filed on June 16, 1992. Plaintiff is an unincorporated association consisting of a group of adult black citizens and

qualified voters in Orange County, Texas.[1] Plaintiff invokes federal question jurisdiction under the Fourteenth and Fifteenth Amendments to the United States Constitution, and under the Voting Rights Act [42 U.S.C. §§ 1971–1975d] and the Civil Rights Act of 1871 [42 U.S.C. § 1983].

Defendants are John McDonald, Ron Sigler, Marcelle Adams, Donald Cole, and Kell Bradford. These persons, respectively, are the county judge and incumbent commissioners of Orange County, Texas.[2]

For nine months after filing, the case gestated through routine pre-trial proceedings. A management conference was convened on September 30, 1992. Following the management conference, a docket control order was entered which called for case preparation to be completed by March 1, 1993. A non-jury trial was scheduled for April 1, 1993.

Two days before trial, defendants moved for a continuance. Before action on the motion was taken, plaintiff and defendants consented for this action to be tried and for judgment to be entered by a United States magistrate judge.[3]

From April, 1993 to date, the court has convened regular status conferences and ruled upon pending motions. The conferences and rulings helped the parties identify a pivotal issue of law affecting the primary Voting Rights Act claim.[4]

The pivotal issue is whether plaintiff can maintain a challenge to the size of a government body, such as the Orange County four-precinct procedure for justices of the peace and constables. The parties have entered relevant stipulations of fact. The issue has been put to the court on cross-motions for summary judgment.

While the cross-motions were under active consideration, the court learned that this issue was pending before the United States Supreme Court. By order dated October 4, 1993, further action was stayed pending the Supreme Court's disposition of *Hall v. Holder*, 955 F.2d 1563 (11th Cir.1992), *cert. granted*, —— U.S. ——, 113 S.Ct. 1382, 122 L.Ed.2d 758 (1993). Pursuant to the Court's decision in *Holder v. Hall*, —— U.S. ——, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994), this case is ripe for disposition.

## II. FACTUAL BACKGROUND

This controversy arises from unique facts. They are not essential to disposition of pending motions, but are appropriately included to enable consideration of legal issues in historical perspective.

Most of the recited "facts" are gleaned from newspaper articles. On March 29, 1993, plaintiff moved for judicial notice of facts reported in the articles. *See* Plaintiff's First Request for Judicial Notice as to Law and Judicial Decisions 6–9. Defendants do not oppose the motion, and the court therefore assumes there is no significant controversy about historical accuracy of the newspaper accounts. For summary judgment purposes only, the court views the newspaper articles as substantially correct.

### A. Redistricting the Commissioners Precincts

In Texas, legislative functions at the county level are performed by a "commissioners

---

1. FED.R.CIV P. 17(b)(1) provides:

   [A] partnership or other unincorporated association, which has no such capacity by the law of such state, may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States....

2. Suit originally was brought against John McDonald, Joe Ware, Marcelle Adams, J.R. Burns, and Kell Bradford—the county judge and commissioners of Orange County, Texas at that time. When a public officer ceases to hold office, the officer's successor is automatically substituted as a party. *See* FED.R.CIV.P. 25(d).

3. Honorable Richard A. Schell entered an order reassigning the case to the undersigned on April 1, 1993.

4. The term "primary" is the court's description. The Voting Rights Act usually is the vehicle of choice for plaintiffs challenging voting practices. This is so because the provides greater voter protection than the Constitution. *See Jones v. City of Lubbock*, 727 F.2d 364 (5th Cir.1984). Also, in a Voting Rights Act case, a plaintiff can prevail by showing only that the challenged practice "results" in unequal opportunity to elect representatives of choice, whereas a constitutional challenge requires a showing of purposeful or intentional racial discrimination. *Id.* at 375.

court," which consists of the county judge and four county commissioners.[5] Completion of the 1990 decennial census resulted in an effort of Orange County, Texas to redistrict its four commissioners precincts.[6]

In July, 1991, Orange County had one black commissioner, Joe Ware, Jr., of Precinct 1. Commissioner Ware was working with a group then called Concerned Citizens Committee ("Concerned Citizens") to redistrict Precinct 1. The avowed purpose of this committee was to give minorities a greater chance of victory should they run for posts in Precinct 1 at any time in the next ten years, not to help Ware get re-elected. Ware cited the elected positions of justice of the peace and constable as examples. Debi D. Butler, *Redistricting Help Rejected*, ORANGE LEADER, July 1, 1991, at 1A, 2A.

All commissioners were involved in the redistricting project. County Judge McDonald twice proposed to hire an outside consultant to help with precinct redistricting. The motion failed once, and on the second attempt died for lack of a second. *Id.* at 1A.

At the same meeting, the commissioners voted unanimously to bring the redistricting plan proposed by Concerned Citizens to a public hearing. Commissioner Burns expressed no opposition to proposed changes in Precinct 1, but was angered by Concerned Citizens' proposal to take voting box 29 from Precinct 2 to Precinct 3. McDonald, meanwhile, had his own plan. McDonald's plan would result in all precinct lines staying the same, except that Rose City would return to Precinct 4. *Id.*

For a while, members of the commissioners court were able to agree upon changes generally satisfactory to all concerns. On September 27, 1991, the commissioners court unanimously approved a compromise commissioners precinct redistricting plan framed by Precinct 3 commissioner Burns. Under the plan, Precinct 1 acquired more than 400 minority residents, resulting in 91.16% of Orange County's black residents being in Precinct 1. Burns commented, "It's been a give and take on all our parts." Ware stated, "The plan may not be the best, but it's a good plan." *Orange County Redistricting Plan Packs Blacks into Precinct 1*, OPPORTUNITY VALLEY NEWS, Oct. 2, 1991, at 1.

Essie Bellfield, a Concerned Citizens member, congratulated the commissioners court, "We've always come up to tell you negative things or to fuss at you. I do want to say to Judge McDonald, Commissioner Burns and Commissioner Ware that you've really worked together." Debi D. Butler, *New Precinct Lines Approved*, ORANGE LEADER, Sept. 27, 1991, at 1A, 2A.

**B. The Call for a Place 2 Justice and Constable**

At that harmonious event, Velma Jeter, a Concerned Citizens member and president emeritus of the Orange chapter of NAACP, stated that Concerned Citizens had one more request, that another line be drawn within Precinct 1 for a Place 2 justice of the peace and constable. She contended that subdivision of the commissioner precinct into two justice/constable places would enable black citizens to elect a black justice and constable. She also suggested, "It won't cost one more penny." *Committee Wants Another Precinct*, OPPORTUNITY VALLEY NEWS, Oct. 2, 1991, at 1.

McDonald and Commissioner Bradford expressed doubts about the no-cost financial projections. Bradford estimated initial costs at $150,000 for the first year. Ware estimat-

---

5. TEX. CONST. art. 5, § 18(b) provides:
   Each county shall, in the manner provided for justice of the peace and constable precincts, be divided into four commissioners precincts in each of which there shall be elected by the qualified voters thereof one County Commissioner, who shall hold his office for four years and until his successor shall be elected and qualified. The County Commissioners so chosen, with the County Judge as presiding officer, shall compose the County Commissioners Court, which shall exercise such powers and jurisdiction over all county business, as is con-

ferred by this Constitution and the laws of the State, or as may be hereafter prescribed.
   The powers and duties of the commissioners court include aspects of legislative, executive, administrative, and judicial functions. *Avery v. Midland County*, 390 U.S. 474, 482, 88 S.Ct. 1114, 1119, 20 L.Ed.2d 45 (1968).

6. *See, e.g.*, TEX.ELEC.CODE ANN. § 42.031(a) (West 1994) (mandating that the commissioners court verify population compliance of county election precincts each odd-numbered year).

ed $120,000, but contended that revenue received would offset the costs. Indeed, Ware stated that he would not support the proposal were it to cost the county.

Jeter and Bellfield, who was a prospective candidate for justice of the peace in the proposed Place 2 position, asked that a statement be included in the county's application for United States Justice Department preclearance of the commissioners' precinct redistricting plan that the Place 2 justice/constable positions would be created if legal. McDonald was unwilling to give such a guarantee, but committed himself to work with Ware to inquire about legalities and realistic costs of the proposal.[7]

The issue was revisited at a commissioners court workshop on Friday, October 25, 1991. McDonald, who stated that he still was not taking a position for or against the proposal, produced information about substantial operational deficits incurred in the existing Precinct 1 justice and constable offices. He also reported that Precinct 1 appeared not to qualify under state law for a Place 2 justice position.[8] Ware disputed McDonald's figures, and Louis Dugas, an attorney for Concerned Citizens, argued against putting a price on justice. Rebecca Shockley, *Precinct Plan Criticized*, BEAUMONT ENTER., Oct. 26, 1991, at 1B.

### C. Revised Request: A Fifth Justice Precinct

The commissioners court convened another public hearing on October 30, 1991. A Con-

cerned Citizens spokesperson announced that the request for a Place 2 justice and constable was being revised so that the group now requested creation of a fifth justice precinct. The fifth justice precinct would be created entirely from within Commissioner Precinct 1, and would be bounded on the north by Interstate Highway 10, on the east by the Sabine River, on the south by Alabama Street, and on the west by Adams Bayou. Rebecca Shockley, *Group Turns up Pressure on County*, BEAUMONT ENTER., Oct. 31, 1991, at 1B [hereinafter *Group Turns up Pressure* ]. Ware stated the reason for the revision was that creation of a Place 2 justice position would not allow more than one constable.[9]

Discussion ensued. Issues of cost and legality were revisited. Reverend Robert Gipson, however, introduced a new reason for the minority community's demands, viz., the need for crime control.[10] McDonald contended that an additional constable precinct would not lower crime in Orange County, as such is the province of the Orange County Police Department.[11]

### D. An Illusory Solution

A breakthrough occurred on November 1. McDonald, after additional discussions with Ware and further study of state law governing creation of justice precincts, concluded that the revised Concerned Citizens proposal

---

7. The above account of the September 27, 1991 commissioners court meeting is taken from *Orange County Redistricting Packs Blacks into Precinct 1*, ORANGE LEADER, Sept. 27, 1991, at 1A; and Debi D. Butler, *New Precinct Lines Approved*, OPPORTUNITY VALLEY NEWS, Oct. 2, 1991, at 1A.

8. The Texas Constitution provides in pertinent part:
   [I]n any precinct in which there may be a city of 18,000 or more inhabitants, there shall be elected two Justices of the Peace....
   TEX. CONST. art. 5, § 18.
   If a city of 18,000 or more exists in a precinct, it is mandatory that a second justice position be created. *See Grant v. Ammerman*, 451 S.W.2d 777 (Tex.Civ.App.–Texarkana 1970, writ ref'd n.r.e.); Op.Tex.Att'y Gen. No. JM–174 (1984). *But see Meredith v. Sharp*, 256 S.W.2d 870 (Tex. Civ.App.–Texarkana, writ raft n.r.e.), 152 Tex. 437, 259 S.W.2d 172 (1953) (per curiam). How-

ever, in order for this provision to take effect, the city must be wholly and entirely within a single justice precinct. *McCraw v. Vickers*, 717 S.W.2d 738 (Tex.App.–San Antonio 1986).

9. While a city of 18,000 or more within a justice precinct shall have two elected Justices of the Peace, there is no similar provision regarding a constable. *See* TEX. CONST. art. 5, § 18.

10. Reverend Gipson additionally pleaded, "No one knows our problems better than ourselves. Allow us to represent ourselves." *Group Turns Up Pressure, supra,* at 1B.

11. McDonald argued the principal duties for constables do not involve law enforcement, but rather include acting as bailiff for the justice of the peace and serving civil papers. *Group Turns Up Pressure, supra,* at 1B.

for a fifth justice precinct would not be illegal. The judge announced that the proposal would be put to a vote at the commissioners court meeting the following Monday, November 4. Debi D. Butler, *Judge Says New Precinct OK,* ORANGE LEADER, Nov. 1, 1991, at 1A.

On November 4th, the commissioners court approved creation of a fifth justice precinct by a three to two vote. Commissioners Ware, Bradford, and Adams voted "For." County Judge McDonald and Commissioner Burns voted "Against." Debi D. Butler, *Final Precinct 5 Vote Planned,* ORANGE LEADER, Jan. 15, 1992, at 1A, 2A. Both the commissioners precinct redistricting plan and the additional justice/constable precinct plan were submitted to the Justice Department for review and preclearance.[12]

The Justice Department promptly acted to preclear the new commissioners precinct lines. However, in early December, 1991, the Justice Department still was reviewing the proposal to create a fifth justice/constable precinct. *Justice Department Approves Orange Precinct Changes,* BEAUMONT ENTER., Dec. 4, 1991, at 3A.

The Justice Department's delay with respect to Justice Precinct 5 was attributable to ambiguity as to its boundaries. While the proposed boundaries initially were stated clearly at the November 4 commissioners court meeting, Ware proposed to "make minor changes" so as to exclude the county courthouse from the new precinct. This would insure that the incumbent Precinct 1 justice of the peace and constable would not have to move their offices. Ware's amendment apparently neither received a second nor was voted on. Rebecca Shockley, *Orange Residents Push for Precinct,* BEAU-

MONT ENTER., Jan. 24, 1992, at 1A [hereinafter *Push for Precinct* ]. Ultimately, the record of the meeting forwarded to the Justice Department reflected only the eastern boundary of the proposed new precinct. Therefore, Justice Department officials could not determine the precinct's legal boundaries. Debi D. Butler, *Commissioners Vote Down Pct. 5,* ORANGE LEADER, Jan. 21, 1992, at 1A [hereinafter *Commissioners Vote* ].

Pragmatic attempts to remedy the error failed. Orange County Clerk, Molly Theriot, mailed a complete boundary description to the Justice Department, apparently labeling the submission as an "amendment." *Push for Precincts, supra,* at 1A. Ware sent in a set of complete boundaries on his own. Debi D. Butler, *Attorneys Await Word on Precinct,* ORANGE LEADER, Jan. 30, 1992, at 1A, 2A. However, the Justice Department insisted on another formal vote of the commissioners court. *Id.*

A second vote was taken at some point not disclosed in the record. In that vote, Commissioner Kell Bradford changed his vote to "Against," thus defeating the creation of a fifth justice precinct.[13]

The second vote did not settle the issue, and a third vote was scheduled for January 21, 1992. The procedure established by the commissioners was to vote first to rescind their action of November 4, 1991, which was deficient for purposes of Justice Department preclearance. Second, the commissioners would vote on a motion to create the fifth justice precinct again, but with proper boundaries. *Commissioners Vote, supra,* at 2A.

Considerable public debate among the commissioners preceded the two votes.[14]

---

**12.** Under § 5 of the Voting Rights Act, 42 U.S.C. § 1973c, covered jurisdictions may enforce changes in their election laws only after obtaining "preclearance" in one of two ways: (i) they may obtain a declaratory judgment in the United States District Court for the District of Columbia that the changes do not have the purpose and will not have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group, or (ii) they may submit the changes to the Attorney General, who then has 60 days in which to object. *City of Lockhart v. United States,* 460

U.S. 125, 128–29, 103 S.Ct. 998, 1001, 74 L.Ed.2d 863 (1983).

**13.** References to the second vote are found in *The Orange Leader,* January 15, 21, and 30, 1992, editions. These articles do not give the date of the second vote or otherwise elaborate on the proceedings.

**14.** There was tension at this meeting. Bellfield complained there were too many law enforcement officers present. There was discussion as to whether the officers were present in their

Ware insisted that the commissioners court had already approved complete boundaries on November 4, 1991. McDonald and Burns persisted in their position that a fifth justice precinct was not needed and would cost too much. Bradford explained that his original vote "For" was intended to indicate only his approval of sending the proposal to Washington for Justice Department review. However, upon further consideration, he feared the new precinct would segregate the black neighborhood. *Escape Clause, supra,* at 1A. Commissioner Adams was absent.

Finally, the commissioners voted. The initial motion to rescind the November 4 resolution passed three to one. Thereupon, Ware moved to re-create the fifth justice precinct with proper boundaries. His motion died for lack of a second. *Id.*

### E. The Aftermath

County Clerk Theriot faxed a formal withdrawal notice to the Justice Department on Wednesday, January 22, 1992. On January 24, a Justice Department spokesman declared the Orange County proposal for a fifth justice precinct a "moot point." Rebecca Shockley, *Orange Precinct Issue Becomes Moot,* BEAUMONT ENTER., Jan. 25, 1992, at 1A.

This lawsuit ensued. Plaintiff alleges that the commissioners' refusal to create a *fifth* justice precinct violates § 2 of the Voting Rights Act because the *four*-precinct voting practice results in black citizens having less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

### III. THE SUMMARY JUDGMENT MOTIONS

The parties' competing motions for summary judgment focus on whether § 2 of the Voting Rights Act requires creation of a fifth justice precinct in a portion of the county where black citizens are concentrated. Plaintiff filed its motion for partial summary judgment on July 1, 1993. Defendants responded and also moved for summary judg-

ment on July 26, 1993. Plaintiff filed a reply on August 5, 1993. Oral arguments were presented at a hearing on August 26, 1993.

### A. The 1982 Amendments

Virtually all United States Supreme Court and courts of appeals opinions addressing the Voting Rights Act and its 1982 Amendments contain comprehensive historical summaries of the Act. *See, e.g., Shaw v. Reno,* — U.S. ——, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993); *Jones,* 727 F.2d at 365. Existing jurisprudence would be expanded needlessly by another lengthy recapitulation of developments leading to amendments in 1982. It suffices here to say that the 1982 amendments govern this controversy.

Section 2 of the Voting Rights Act, as amended in 1982, provides as follows:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973(b)(f)(2) of this title, as provided by subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected

---

official capacity or were off duty and there only as interested residents of Precinct 1. Sheriff's Sgt. David Bailey "addressed the court and plainly said no one had asked him to attend."

Ann Kate & Debi D. Butler, *Precinct 5 Escape Clause,* ORANGE LEADER, Jan. 22, 1992, at 1A, 2A [hereinafter *Escape Clause*].

class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

Congress enacted the 1982 Voting Rights amendments to overrule early judicial construction of the statute. In *Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), the Supreme Court held that evidence of discriminatory *intent* was required for a successful vote dilution claim under the Voting Rights Act. This essentially was the same standard employed by a court in analysis of a constitutional challenge to a voting practice. Congress, however, intended for the Voting Rights Act to provide even greater protection than the Constitution. *See Jones*, 727 F.2d at 375. Thus, the amendment and accompanying legislative history make clear that Congress wanted to prohibit any voting scheme which *results* in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color, irrespective of whether purposeful or intentional racial discrimination is involved. *See* REPORT OF THE SUBCOMMITTEE ON THE CONSTITUTION, VOTING RIGHTS ACT, AMENDMENTS of 1982, S.REP. 417, 97th Cong., 2d Sess., *reprinted in* 1982 U.S.C.C.A.N. 177, 312 ["The House bill [subsequently adopted] changes the gravamen of the claim of proof [to a] disparate election result."] [hereinafter REPORT].

Codification of the "results test" was controversial. There was general support for the idea that a voting practice or procedure which is discriminatory in result should not be allowed to stand, regardless of whether there exists a discriminatory purpose. But the results test also generated fear that the standard could be interpreted as the grant of a right of proportional representation, an idea repugnant to democratic principles.[15]

The matter was stalemated until Senator Robert Dole forged what became known as the "Dole Compromise." Senator Dole secured bipartisan support for insertion of language that explicitly rejected the notion that members of the protected class would have a right to be elected in numbers equal to their proportion of the population:

The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected

---

**15.** The Senate Judiciary's Subcommittee on the Constitution report concerning the 1982 amendments states clearly:

Put simply, proportional representation refers to a plan of government which adopts the racial or ethnic group as the primary unit of political representation and apportions seats in electoral bodies according to the comparative numerical strength of these groups.

. . . . .

On this point, the testimony was virtually unanimous in conclusion: Proportional representation is contrary to our political tradition and ought not to be accepted as a general part of our system of government at any level.

. . . . .

Professor [Walter] Berns [of the American Enterprise Institute] . . . testified:

Representative government does not imply proportional representation, or any version of it that is likely to enhance bloc voting by discrete groups. The Framers of the Constitution referred to such groups as "factions," and they did their best to minimize their influence. . . .

. . . . .

The testimony of Professor [Edward] Erler [of the National Humanities Center] sounded the same theme:

. . . Proportional representation makes it impossible for the representative process to find a common ground that transcends factionalized interests . . . The genius of the American system is that it requires factions and interests to take an enlarged view of their own welfare, to see, as it were, their own interest through the filter of the common good.

. . . . .

The subcommittee adopts these views and believes that proportional representation ought to be rejected as undesirable public policy totally apart from the constitutional difficulties that it raises, and the racial consciousness that it fosters.

REPORT, *supra*, *reprinted in* 1982 U.S.C.C.A.N. at 319–20.

class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

Senator Dole characterized the compromise as follows:

> As expressed in the language of the subsection, the standard is whether the political processes are equally "open" in that members of a protected class have the same *opportunity* as others to participate in the political process and to elect candidates of their choice. In other words, the focus of the standard is on whether there is equal access to the political process, not on whether members of a particular minority group have achieved proportional elections results.

Attachment B, Additional Views of Senator Robert Dole, REPORT, *supra, reprinted in* 1982 U.S.C.C.A.N. at 363, 364.

Senator Charles Grassley characterized the purpose of the compromise thus:

> Although there were hard-fought battles over the specific language of this proposal, a consensus developed in this Committee that plain and simply, effective bars to the full and fair political participation by all citizens must be removed, whether those bars are intentional or not; but that there be safeguards to guarantee that what we are banning is actual discrimination in the political processes, not disproportionate electoral outcomes, per se.

Attachment B, Supplemental Views of Charles E. Grassley, REPORT, *supra, reprinted in* 1982 U.S.C.C.A.N. at 366.

### B. The Gingles Threshold Test

With the political controversy settled, the focus turned to litigants and courts. In the juridic context, participants must abandon rhetoric and focus on *"cold legalise"* [sic].[16] Not unexpectedly, new problems became apparent.

Despite extensive legislative history for guidance, courts and litigants concerned with claims of Voting Rights Act violations under the results test were directed to apply an imprecise "totality of the circumstances" analysis. Such an inquiry can be exceedingly subjective, leading to almost unbridled judicial discretion. *See* C. Robert Heath, *Managing the Political Thicket: Developing Objective Standards in Voting Rights Litigation,* 21 STETSON L.REV. 819 (1992), citing *McNeil v. Springfield Park Dist.,* 851 F.2d 937, 942 (7th Cir.1988), *cert. denied,* 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989).

■ The first case in which the Supreme Court considered the amended § 2 was *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). In *Gingles,* the Court provided some structure to the statute's totality of the circumstances standard in a case challenging multi-member legislative districts. The Court established three "necessary preconditions" Voting Rights Act plaintiffs must meet as a threshold matter. *Gingles,* 478 U.S. at 48, 106 S.Ct. at 2765. The minority group initially must prove by a preponderance of the evidence that:

> 1. It is sufficiently large and geographically compact to constitute a majority in a single member district;
>
> 2. Its members are politically cohesive; and
>
> 3. The white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances—usually to defeat the minority group's preferred candidate.

*Gingles,* 478 U.S. at 48–51, 106 S.Ct. at 2765–67.

The Court reasoned that

> [t]hese circumstances are necessary preconditions for multimember districts to operate to impair minority voters' ability to elect representatives of their choice for the following reasons. First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. If it is not, as would be the case in a substantially integrated district, the *multimember form* of the dis-

---

**16.** Politicians found this premise disconcerting. "Developing the Committee bill was not a simple undertaking. The heartfelt problem in this instance was not one easily addressed by cold legalise [sic]." Attachment B, Supplemental Views of Charles E. Grassley, REPORT, *supra, reprinted in* 1982 U.S.C.C.A.N. at 366.

trict cannot be responsible for minority voters' inability to elect its candidates. . . . Second, the minority group must be able to show that it is politically cohesive. If the minority group is not politically cohesive, it cannot be said that the selection of a multi-member electoral structure thwarts distinctive minority group interests. . . . Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed . . . usually to defeat the minority's preferred candidate. . . . In establishing this last circumstance, the minority group demonstrates that submergence in a white multi-member district impedes its ability to elect its chosen representatives.

*Id.* at 50–51, 106 S.Ct. at 2766–67 (footnote and citations omitted).

It is now well-established that failure to establish any one of the *Gingles* factors precludes a § 2 violation. *See Brewer v. Ham,* 876 F.2d 448, 451 (5th Cir.1989).[17]

### C. The Summary Judgment Contentions

The parties' competing motions for summary judgment focus on the first *Gingles* factor. Plaintiff contends that Article 5, Section 18 of the Texas Constitution authorizes the Orange County commissioners court to divide Orange County into not less than four, nor more than eight justice precincts. Plaintiff asserts that Orange County has a white voting age population of 52,422, a black voting age population of 4365, and an Asian

voting age population of 286.[18] If four additional precincts were created and apportioned equally, each precinct would have approximately 7000 voters. *See* Plaintiff's Response to Defendants' Motion for Summary Judgment 3. One newly created justice precinct could be drawn primarily along the lines of existing county voting boxes 2, 3, 4, and 5—giving that precinct a majority of black voters.

Defendants contend that plaintiff cannot bootstrap itself by hypothesizing additional voting districts. Instead, the court must analyze the first *Gingles* factor under the existing framework, which includes only four justice precincts. Defendants agree that the minority population of Orange County is geographically compact; however, they argue unopposed that it is not sufficiently large to constitute a majority in any of four single member districts.

### IV. DISCUSSION AND ANALYSIS

#### A. Demographics

This opinion assumes, without deciding, that plaintiff is correct when contending that black voting age citizens are sufficiently numerous and geographically compact enough to form a majority in one of eight justice precincts. This working assumption is based primarily on lack of any formal opposition by defendants, and the absence of any suggestions from defendants that black voting age population and demographics are different than alleged by plaintiff.[19]

---

17. *Gingles* provided structure for a principled analysis of necessary preconditions for a successful claim under § 2. Once the *Gingles* preconditions are satisfied, however, the lower courts remain irresolute about how to apply the imprecise "totality of the circumstances" test. The Seventh Circuit recently expressed its uncertainty as follows:

> We wish we knew exactly what a plaintiff must prove in order to prevail under the Voting Rights Act. Section 2(b), 42 U.S.C. § 1973(v), directs the trier of fact to consider "the totality of the circumstances," and the judicial glosses on this vague phrase do not provide clear guidance.

*Barnett v. Daley,* 32 F.3d 1196, 1201–02 (7th Cir.1994).

18. While the voting age populations for Native Americans and "other" are unavailable, the total

population for such groups are 189 and 461 respectively.

19. The parties submitted a stipulation which is internally inconsistent and contrary to other data each side submitted respectively. For example, the parties' stipulations recite that 91.16% of Orange County's black population reside in Commissioner's Precinct 1. *See* Stipulations of Parties ¶ I 1. According to the South East Texas Regional Planning Commission's recapitulation of 1990 Census data, the total black population for the entire county is 6734. *See* Plaintiffs' Request For Judicial Notice Census Data, Attachment B. Applying the stipulated percentage (91.16%) results in the determination that 6139 black *persons* reside in Commissioner's Precinct 1. The stipulations, however, recite that Commissioner's Precinct 1 contains 6450 black *vot-*

Plaintiff's contention can be independently confirmed, at least informally, by reference to data in the 1991 Texas Legislative Council's "Voting Counts" compilation. *See* Plaintiff's Response to Defendants' Motion for Summary Judgment Exhibit B. That document reflects that the total voting age population of the county is 57,527. If divided into eight justice precincts, the ideal voting age population for each would be 7190.

■ Plaintiff asserts that the fifth justice precinct should be drawn essentially around existing voting boxes 2, 3, 4, and 5. Total voting age population in these boxes is only 6177, or 1013 less than the ideal size precinct. However, voting districts may vary from the ideal by ten percent without being constitutionally infirm. *See Gaffney v. Cummings,* 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973). This could lower the minimum target to 6471 voting age residents, leaving a deficit of only 294.[20] It is reasonable to assume that Orange County's commissioners could annex

*ers. See* Stipulations of Parties ¶ II 2. This is more than the entire black population in the precinct.

Further, it reflects an unrealistically high percentage (96%) of black voting age residents in comparison to the county's total black population. Historically, minority groups register and vote at lower rates, have more persons below voting age, and have a higher proportion of noncitizens among their population. Adam J. Chill, *The Fourteenth And Fifteenth Amendments with Respect to the Voting Franchise: A Constitutional Quandary,* 25 COLUM J.L. & SOC.PROBS. 645 (1992).

20. The Equal Protection Clause may not require voting districts for judicial positions to satisfy the "one person, one vote" doctrine. *See Wells v. Edwards,* 347 F.Supp. 453 (M.D.La.1972) (holding that judicial elections not subject to "one person, one vote" because nature of the office is not "representative"), *summarily aff'd,* 409 U.S. 1095, 93 S.Ct. 904, 34 L.Ed.2d 679 (1973); *But see Chisom v. Roemer,* 501 U.S. 380, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991) (holding that judicial elections are "representative" within meaning of Voting Rights Act). Even so, the Equal Protection Clause would prohibit creation of a justice precinct based solely on racial factors, absent a compelling governmental interest. *See Shaw v. Reno,* —— U.S. ——, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) and *Vera v. Richards,* 861 F.Supp. 1304 (S.D.Tex.1994) (both holding racially gerrymandered voting districts unconstitutional and both referring to such practices as "apartheid".)

this many additional voting age residents from adjacent areas without creating a precinct so extremely irregular on its face that it could rationally be viewed only as an effort to segregate races for purposes of voting.

■ This analysis assumes that the appropriate analytical and remedial standard is bare majority of voting age population. The criterion of the Fifth Circuit appears to be *voting age* population. *See Magnolia Bar Ass'n, Inc. v. Lee,* 994 F.2d 1143 (5th Cir. 1993). Where race is at issue, however, at least one other Court of Appeals argues that total population may be a better indicia to adequacy of representation than voting age population. *See Barnett,* 32 F.3d at 1202–03. *Barnett* observes that a total population analysis typically favors protected minority groups because they have higher proportions of young people who have not reached voting age. As the footnote demonstrates, however, utilization of voting age population produces a better result for plaintiff in this case.[21]

21. When total population is used, protected minority groups must have at least a 65% majority in the electoral district have reasonable assurance of electing a candidate of their choice and create a "safe district." *United Jewish Orgs. v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977) (plurality opinion). "The figure is derived by augmenting a simple majority with an additional 5% for young populations, 5% for low voter registration, and 5% for low voter turnout." *Ketchum v. Byrne,* 740 F.2d 1398, 1405 (7th Cir.1984), *cert. denied,* 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985). If the "safe districting rule" were applied in this case, the following analysis shows that it would work atypically against plaintiffs.

Orange County's total population in 1991 was 80,509. See 1991 Texas Legislative Council Voting Counts 1. If there were eight justice precincts, the ideal population for each would be 10,064. Under the 10% deviation rule, one precinct could consist of as few as 9058. Voting boxes 2–5 contain a total population of 8663, or a deficit of 395. Assuming the deficit is remedied to establish a precinct with 9058 residents, one can compute whether a "safe" majority of black residents would exist.

Total black residents in voting boxes 2–5 number 5220. They would constitute a majority of only 57.6% in a precinct of 9058. Even if the additional 395 persons added to remedy the deficit were all black, the percentage would increase to only 61.9%. Both percentages fall below the 65% target for a "safe" minority-majority voting district.

Thus, there is no reason to wrestle with the distinction suggested in *Barnett.*

Black voting age residents in existing voting boxes 2, 3, 4, and 5 total 3449. In a new justice precinct centered around voting boxes 2–5, and containing a minimum of 6471 voting age residents, black citizens would enjoy a 53.3% majority.

## B. *Increasing the Number of Precincts*

Early cases seemed to split on the issue of whether Voting Rights Act plaintiffs could (a) hypothetically increase voting districts to the number necessary to create an effective majority for a protected class of voters, (b) use the hypothetical number to prove a Voting Rights Act violation, and (c) secure an injunctive remedy based on that number. *See Carrollton Branch of NAACP v. Stallings,* 829 F.2d 1547 (11th Cir.1987) (holding hypothetical evidence admissible), *cert. denied sub nom., Duncan v. Carrollton,* 485 U.S. 936, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988); *Dillard v. Baldwin County Comm'n,* 694 F.Supp. 836 (M.D.Ala.), *aff'd without opinion,* 862 F.2d 878 (11th Cir.1988). *Contra Hines v. Ahoskie,* 998 F.2d 1266 (4th Cir. 1993) (rejecting hypothetical evidence); *McNeil v. Springfield Park Dist.,* 851 F.2d 937 (7th Cir.1988), *cert. denied,* 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989); *Skorepa v. City of Chula Vista,* 723 F.Supp. 1384 (S.D.Cal.1989). The United States Court of Appeals for the Fifth Circuit twice faced the issue, but did not decide it on either occasion. *See Magnolia Bar Ass'n,* 994 F.2d at 1151; *Overton v. City of Austin,* 871 F.2d 529 (5th Cir.1989).

In its present term, the Supreme Court decided *Holder v. Hall,* —— U.S. ——, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994). In *Holder,* plaintiffs challenged the commissioner system of Bleckley County, Georgia, under which a single commissioner held all legislative and executive authority. The County was authorized by state law to adopt a multi-member commission consisting of five members—and thus, allowed creation of a district

in which minorities could constitute a majority. *Id.* at ——, 114 S.Ct. at 2584.

Justice Kennedy announced the judgment of the Court and delivered an opinion which observed that the search for a reasonable benchmark by which to evaluate a challenged voting practice "is quite problematic when a § 2 dilution challenge is brought to the size of a government body." *Id.* at ——, 114 S.Ct. at 2586 (Kennedy, J.). Justice Kennedy concluded that there is no principled reason why one size should be picked over another as the benchmark for comparison. Hence, the Court held that the size of a governing authority is not subject to a vote dilution challenge under § 2 of the Voting Rights Act. *See Holder,* —— U.S. at ——, 114 S.Ct. at 2586 ("[W]here there is no objective and workable standard for choosing a reasonable benchmark by which to evaluate a challenged voting practice, it follows that the voting practice cannot be challenged as dilutive under § 2.").

*Holder* directly applies to the Orange County redistricting dispute. Plaintiff's claim for relief under § 2 of the Voting Rights Act is dependent upon the argument that Orange County should create a fifth justice precinct. With respect to challenges to the size of a governing authority, five members of the Supreme Court concur in the conclusion that:

> The wide range of possibilities makes the choice "inherently standardless …," and we therefore conclude that a plaintiff cannot maintain a § 2 challenge to the size of a government body …

*Holder,* —— U.S. at ——, 114 S.Ct. at 2588.

Plaintiff has submitted a supplemental memorandum to comment on the effect of *Holder.* Plaintiff argues that *Holder* is distinguishable because the county commissioners initially voted to create a new district, but abolished it prior to Justice Department preclearance. Plaintiff's strongest point, however, is the second argument that plaintiff has not pursued an "inherently standardless" theory involving a "wide range of possibilities." Plaintiff reasserts that the Texas

---

Plaintiff's strongest position, therefore, is to argue for an analysis based on voting age population, and a bare majority standard. As stated,

*supra,* this approach is used for present purposes.

Constitution establishes a discrete, narrowly circumscribed standard of four to eight justices for counties with populations of 30,000 or more. Plaintiff further argues that it does not attempt to create an "unprincipled" position, as numerous Texas counties varying in size have five or more justice precincts.

Under *Holder*, it does not matter for Voting Rights Act purposes that State law provides Orange County may have between four and eight precincts, *see* TEX. CONST. art. 5, § 18, or that the Orange County Commissioners previously voted to create an additional district. *Holder* concluded:

> That the single-member commission is uncommon in the State of Georgia, or that a five-member commission is quite common, tells us nothing about its effects on a minority group's voting strength

and

> [t]hat Bleckley County was authorized by the State to expand its commission, and that it adopted a five-member school board, are likewise irrelevant considerations in the dilution inquiry.

*Holder*, —— U.S. at ——, 114 S.Ct. at 2586.

■ Under these circumstances, the court is bound by the decision in *Holder*.[22] No vote dilution claim exists under § 2 of the Voting Rights Act if expansion of the size of the existing governing body must occur to satisfy the first *Gingles* factor. As black citizens of Orange County cannot reach a voting age majority in any precinct without creation of additional precincts, the Voting Rights Act claim must fail.

### V. CONCLUSION

For reasons given above, defendants are entitled to a partial summary judgment. An order granting defendants' motion and denying plaintiff's motion accompanies this opinion. A final judgment on plaintiff's Voting Rights Act claim will be entered pursuant to Federal Rule of Civil Procedure 54(b).

---

22. *See Hutto v. Davis*, 454 U.S. 370, 375, 102 S.Ct. 703, 706, 70 L.Ed.2d 556 (1982) (per curiam) ("unless we want anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts...."). The American judiciary has long placed a premium upon the doctrine of stare decisis, especially its "vertical application," which commands trial courts to adhere to its jurisdiction's appellate court precedents and ultimately, those of the United States Supreme Court. *See* Thomas W. Merrill, *Judges Opinions as Binding Law as Explanations for Judgments*, 15 CARDOZO L.REV. 43, 44 (1993).